In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 14-2904

CMFG LIFE INSURANCE CO.,
CUMIS INSURANCE SOCIETY, INC., and
MEMBERS LIFE INSURANCE CO.,

*Plaintiffs-Appellants*,

*v.*

RBS SECURITIES, INC.,

*Defendant-Appellee*.

---

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:12-CV-00037 — **William M. Conley**, *Chief Judge*.

---

ARGUED APRIL 1, 2015 — DECIDED AUGUST 21, 2015

---

Before WOOD, *Chief Judge*, FLAUM, *Circuit Judge,* and
KENNELLY, *District Judge*.[1]

KENNELLY, *District Judge*. Between 2004 and 2007, CUNA
Mutual, an insurance company, purchased fifteen residential

---

[1] Of the United States District Court for the Northern District of Illinois, sitting by designation.

mortgage-backed securities from RBS Securities, Inc. Then the housing market crashed, and the securities with it. CUNA now wants out of the deals. CUNA alleges that RBS induced it to purchase the securities by materially misrepresenting that the underlying mortgages complied with underwriting guidelines. The district court granted summary judgment on all but one of CUNA's rescission claims, and CUNA appealed. We reverse in part and affirm in part.

## I. Background

The plaintiffs in this case are CMFG Life Insurance Co., CUMIS Insurance Society, Inc., and Members Life Insurance Co., collectively called CUNA Mutual. CUNA sells insurance and other investment products to credit unions. In addition to selling investment products, CUNA maintains its own investment portfolio. Between 2004 and 2007, CUNA purchased a number of residential mortgage-backed securities from RBS Securities, Inc. This case involves fifteen of those securities.

During the time period at issue in this case, creation of a mortgage-backed security began with origination of individual mortgage loans. In deciding whether to make a loan, originators evaluated credit risk using underwriting guidelines. These guidelines were "designed to gauge two crucial factors of credit risks: (1) borrower ability to pay and (2) sufficiency of collateral (the mortgaged property) if the borrower defaults."[2] Appellant's Br. at 5. Through a complicated

---

[2] CUNA notes that "[o]ccasionally, noncompliant loans [could] be made appropriate credit risks by legitimate 'compensating factors' such as low debt-to-income ratio, high borrower assets, or low [loan-to-value] ratio." Appellant's Br. at 5. As used by the parties, "guidelines compli-

process involving several intermediaries, hundreds or thousands of mortgages would be purchased from originators and bundled into securities. Securities underwriters—here, RBS—then sold these securities to investors. The mortgage payments (or, in the event of default, foreclosure sale proceeds) provided a stream of income to investors.

Underwriting guidelines were important to investors for determining the value of securities: the lower the borrower's ability to pay (or the lower the property value), the greater the risk of default (and more defaults, of course, means less income for investors). Written representations of guidelines compliance were also important to investors because such representations created a legally-enforceable duty. Because originators did not keep the mortgages on their books, they did not bear any risk of default by the mortgagors. Thus, aside from reputational consequences, litigation was the primary deterrent against lax compliance with underwriting guidelines.

The fifteen securities RBS sold to CUNA were registered under SEC Form S-3, known as "shelf" registration. Shelf registration permitted the issuer to "register asset-backed securities to be offered on a delayed basis in the future through one or more offerings, or 'takedowns,' of securities off of the shelf registration statement." Final Rule, *Asset-Backed Securities*, 70 Fed. Reg. 1506, 1512 (Jan. 7, 2005); *see also* 17 C.F.R. § 230.415.[3] If registered in this manner, "the regis-

---

ance" refers to loans that complied with the guidelines and loans with legitimate compensating factors.

[3] RBS argues that the excerpts of this SEC final rule from the Federal Register are inadmissible hearsay. But "[t]he contents of the Federal Register shall be judicially noticed." 44 U.S.C. § 1507. Additionally, CUNA's

tration statement [was] often presented through the use of two primary documents: the 'base' or 'core' prospectus and the prospectus supplement." *Id.* The base prospectus "outline[d] the parameters of the various types of [asset-backed securities] offerings that may be conducted in the future"; the prospectus supplement "outline[d] the format of deal-specific information that [would] be disclosed at the time of each takedown." *Id.* at 1512–13. "At the time of a takedown, a final prospectus supplement [was] prepared which describe[d] the specific terms of the takedown, and the base prospectus and the final prospectus supplement together form[ed] the final prospectus … ." *Id.* at 1513; *see also* 17 C.F.R. § 230.430B; 17 C.F.R. § 229.512(a)(1). After a Form S-3 registration was filed, the SEC permitted issuers to sell securities using term sheets—even before availability and delivery of the final prospectus supplement. *Id.* at 1554–55. As we will discuss in greater detail below, investors in the mortgage-backed securities market often made purchase decisions on term sheets alone.

Following the housing market crash, the fifteen securities at issue in this case declined in value. CUNA commissioned a forensic study of the loan pools underlying the securities. The study found that approximately 40.8 percent of the loans were materially defective, meaning that "they violated applicable underwriting guidelines in a manner that materially increased the credit risk of the loan and that was not justified by sufficient compensating factors." App. at 1681.

---

expert witness may testify based on this final rule. *See* Fed. R. Evid. 703. Thus, because the final rule can be "presented in a form that would be admissible in evidence," it may be considered at summary judgment. *See* Fed. R. Civ. P. 56(c)(2).

CUNA now alleges that RBS induced it to purchase the securities by materially misrepresenting that the underlying loans complied with underwriting guidelines. First, CUNA alleges that RBS repeatedly assured CUNA's mortgage-backed securities trader, Mark Prusha, that extensive due diligence was conducted on the loan pools. Second, CUNA alleges that the relevant base and supplemental prospectuses expressly represented that the loans complied with the guidelines. Absent these misrepresentations, CUNA asserts, it would not have purchased the securities.

CUNA sued RBS in Wisconsin state court for rescission based on these alleged misrepresentations. Defendants removed the case to federal court in 2012. Two years later, the parties cross-moved for summary judgment. The district court granted summary judgment in RBS's favor on all but one of CUNA's rescission claims. The district court also held that CUNA's claims with regard to nine of the fifteen securities were time-barred and denied CUNA's motion for leave to amend. CUNA stipulated to judgment on the remaining claim and appealed.

## II. Discussion

CUNA has appealed the district court's decisions granting summary judgment in favor of RBS and denying CUNA leave to amend its complaint. We review the district court's grant of summary judgment de novo, construing all facts and reasonable inferences in the light most favorable to CUNA. *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 876 (7th Cir. 2014). We also review summary judgment based on a statute of limitations de novo. *Bernstein v. Bankert*, 733 F.3d 190, 199 (7th Cir. 2013). We review denial of leave to amend a com-

plaint for abuse of discretion. *Johnson v. Cypress Hill*, 641 F.3d 867, 871 (7th Cir. 2011).

### A. Statute of Limitations

Section 893.43 of the Wisconsin Statutes provides that "[a]n action upon any contract, obligation or liability, express or implied … shall be commenced within 6 years after the cause of action accrues or be barred." Wis. Stat. § 893.43. The district court held that this statute of limitations governed claims for rescission and, accordingly, that CUNA's claims regarding nine of the fifteen certificates at issue in this case were time-barred. *CMFG Life Ins. Co. v. RBS Sec. Inc.*, No. 12–cv–037–wmc, 2014 WL 3696233, at *26 (W.D. Wis. July 23, 2014). CUNA has appealed this determination. Although CUNA acknowledges that rescission is a contractual remedy, it contends that a claim for rescission is not an action "upon" a contract, as required by the section 893.43. Rather, CUNA contends, "rescission seeks to *disaffirm* a contract, not sue 'upon' it." Appellant's Br. at 29.

"To avoid the danger of subverting the legislative intent," the Wisconsin Supreme Court "interpret[s] statutes of limitation so that no person's cause of action will be barred unless clearly mandated by the legislature." *Saunders v. DEC Int'l, Inc.*, 85 Wis. 2d 70, 74, 270 N.W.2d 176, 177 (1978); *see also Erdman v. Jovoco, Inc.*, 181 Wis. 2d 736, 760, 512 N.W.2d 487, 495 (1994) (citing *Saunders* with approval). Where a cause of action is not "clearly within" a statute of limitations, the statute "should not be extended by construction." *Green v. Granville Lumber & Fuel Co., Inc.*, 60 Wis. 2d 584, 590, 211 N.W.2d 467, 470 (1973). This standard accords with a "general philosophy of insuring that litigants shall have their day

in court unless clearly barred." *Saunders*, 85 Wis. 2d at 74, 211 N.W.2d at 178.

The Wisconsin Supreme Court has not ruled on whether section 893.43 applies to claims for rescission. We must therefore predict how the court would decide this question.

We begin with Wisconsin precedent. Although not a statute of limitations case, the Wisconsin Supreme Court's decision in *Beers v. Atlas Assurance Co.*, 231 Wis. 361, 285 N.W. 794 (1939), provides insight into the meaning of the phrase "action upon the contract." There, the court held that "the plaintiff having elected in two of his complaints to affirm the contract and to sue for such damage as he had sustained as a result of the asserted fraud and deceit, he may not now allege a cause of action based upon a disaffirmance of the contract and ask for rescission." *Id.* at 361, 285 N.W. at 797. The court explained that "a person has a right to elect either to stand *upon the contract* which the defendant has induced and recover the damages resulting, or rescind the contract, and upon returning what he has received, recover back that with which he has parted." *Id.* (emphasis added). These remedies are "wholly inconsistent," the court added, because "[e]ither there is a contract, for breach of which plaintiff is entitled to recover damages, or the contract is set aside and goes out of existence." *Id.*; *see also Schnuth v. Harrison*, 44 Wis. 2d 326, 340, 171 N.W.2d 370, 377 (1969) ("[W]hen a contract is rescinded the parties are placed in the status quo as if no contract had ever been made."). The Wisconsin Supreme Court has frequently repeated this distinction. *Smeesters v. Schroeders*, 123 Wis. 116, 101 N.W. 363, 363–64 (1904); *Palmer v. Goldberg*, 128 Wis. 103, 107 N.W. 478, 479 (1906); *Bischoff v. Hustisford State Bank*, 195 Wis. 312, 218 N.W. 353, 357 (1928);

*Schlotthauer v. Krenzelok*, 274 Wis. 1, 4, 79 N.W. 2d 76, 78 (1956). More recently, a Wisconsin appellate court observed that "an action on a contract for breach and an action to rescind a contract … are inconsistent because the former stands on the contract and the latter seeks to set it aside." *Galatowitsch v. Wanat*, 239 Wis. 2d 558, 570, 620 N.W.2d 618, 624 (Ct. App. 2000).

Although somewhat dated, these decisions indicate that the Wisconsin Supreme Court would hold that rescission is not an "action upon a contract" as used in section 893.43. Our prediction finds additional support in the Restatement of Restitution. Although the Restatement acknowledges that "[r]escission is usually invoked in a contractual setting," it indicates that the remedy is not "upon" the contract. Restatement (Third) of Restitution and Unjust Enrichment § 54 cmt. b (2011). Rather, "[a] claimant who is allowed to rescind has usually been given a choice between (i) dealing with the other party on the basis of their agreement, which the claimant was free to ratify and enforce, and (ii) dealing with the other party *'off the contract*,' where benefits that either party may have derived at the expense of the other give rise to a liability in unjust enrichment." *Id.* (emphasis added). The drafters of the Restatement describe the former remedy as "contractual"; they describe the latter as "extracontractual." *Id.* In deciding cases involving rescission, the Wisconsin Supreme Court has drawn from restatements, including the Restatement of Restitution.[4] This leads us to

---

[4] For instance, when faced with the question of "when a contract will be deemed voidable and subject to rescission by one of the parties," the Court expressly "adopt[ed] the position taken in the Restatement (Second) of Contracts." *First Nat'l Bank & Trust Co. of Racine v. Notte*, 97 Wis.

believe that the Restatement view would inform how the court would decide the question presented in this case.

Based on this authority, we predict that the Wisconsin Supreme Court would hold that rescission is not an "action upon the contract," as that phrase is used in section 893.43. Although we think this reading follows from Wisconsin case law, it also hews more closely to the plain wording of section 893.43. Claims for rescission do not "stand upon" the rights and obligations established by the contract; they seek to put the contract "out of existence." *Beers*, 231 Wis. at 361, 285 N.W. at 797. We therefore reverse the district court's grant of RBS's motion for summary judgment on its statute of limitations defense.

RBS points us to *Harley-Davidson Motor Co. v. PowerSports, Inc.*, 319 F.3d 973 (7th Cir. 2003). There, we observed that rescission based on intentional misrepresentation is "a remedy expressly given … through contract law," not tort law, and thus not an "end run around contract law" for the

---

2d 207, 222, 293 N.W.2d 530, 538 (1980). The Court has also cited to the Restatement of Restitution, both in rescission cases, *see Thompson v. Vill. of Hales Corners*, 115 Wis. 2d 289, 319, 340 N.W.2d 704, 718 (1983) (citing the Restatement (First) of Restitution for the proposition that "[a] party's right to rescind for fraud or mistake is waived if he unreasonably delays in asserting that right or affirms the agreement after learning of the fraud or mistake giving rise to the right of rescission"), and in other contexts, *see Lawlis v. Thompson*, 137 Wis. 2d 490, 498, 405 N.W.2d 317, 320 (1987) (noting that "[t]he jurisprudence of unjust enrichment in Wisconsin is consistent with that found in the recognized treatises and encyclopedias," and specifically citing the Restatement (First) of Restitution); *Wis. Patients Comp. Fund v. Wis. Health Care Liab. Ins. Plan*, 200 Wis. 2d 599, 621, 547 N.W.2d 578, 586 (1996) (noting that the Court's conclusion was "bolstered" by the Restatement (First) of Restitution).

purposes of Wisconsin's economic loss doctrine. *Id.* at 987. The fact that a remedy arises from contract law, however, does not make it a remedy *upon* the contract. Indeed, as we explained in *Harley-Davidson*, the duty underlying the rescission remedy does not "arise from the terms of the agreement," but from "a duty not to fraudulently induce a person into a bargain." *Id.* at 986.

RBS also relies on *First National Bank and Trust Co. of Racine v. Notte*, 97 Wis. 2d 207, 293 N.W.2d 530 (1980). For similar reasons, however, *Notte* is inapposite. In that case, the suit itself was to "recover on [the] contract" for breach; rescission was raised as a defense "to the contract." *Id.* at 212, 293 N.W.2d at 533. The Wisconsin Supreme Court was asked to decide whether the lower court had erred by instructing the jury on comparative negligence (the rescission defense was based on negligent misrepresentation). *Id.* at 211–12, 293 N.W.2d at 533. Because rescission is a contractual remedy, the court concluded that it must "look to principles of contract and suretyship law in framing the issues and formulating a mode of analysis," not "traditional tort concepts of misrepresentation." *Id.* at 212, 293 N.W.2d at 533. Applying this framework, the court held that "discussion of comparison of negligence between the parties"—a defense that only arises in tort—"is inappropriate." *Id.* at 213, 293 N.W.2d at 533. Thus, like *Harley-Davidson*, *Notte* simply stands for the proposition that rescission arises from contract law. That does not make rescission an action upon a contract.

CUNA urges us to also hold that the proper statute of limitations is section 893.93(1)(b). Section 893.93(1)(b) provides that "[a]n action for relief on the ground of fraud" must be "commenced within 6 years after the cause of action

accrues or be barred." Wis. Stat. § 893.93(1)(b). However, unlike section 893.43, section 893.93(1)(b) includes a discovery provision: "The cause of action in such case is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud." *Id.* If measured from the date of discovery, all of CUNA's rescission claims would be timely.

We do not need to decide whether section 893.93(1)(b) applies to CUNA's rescission claim, because the alternative to applying section 893.93(1)(b) is that no statute of limitations applies. Although Wisconsin has a general statute of limitations for any "action upon a liability created by statute when a different limitation is not prescribed by law," it does not have an equivalent statute of limitations for equitable remedies such as rescission. Wis. Stat. § 893.93(1)(a).[5] Thus, regardless of whether section 893.93(1)(b) applies, CUNA's rescission claim is not time-barred.

Of course, CUNA's rescission claim still may be subject to the defense of laches, a defense that is available to RBS regardless of whether section 893.93(1)(b) applies. *See Zizzo v. Lakeside Steel & Mfg. Co.*, 312 Wis. 2d 463, 469, 752 N.W.2d 889, 892 (2008) ("Laches is distinct from a statute of limita-

---

[5] At one time, Wisconsin had a 10-year statute of limitations for "[a]n action which, on and before February 28, 1857, was cognizable by the court of chancery, when no other limitation is prescribed in this chapter." *Hammes v. First Nat'l Bank*, 102 Wis. 2d 720, 308 N.W.2d 419 (Ct. App. 1981); *see also Pietsch v. Wegwart*, 178 Wis. 498, 190 N.W. 616, 619 (1922). The chancery statute of limitations, however, "was repealed by ch. 323, Laws of 1979." *Id.* at *4 n.4. No statute of limitations was adopted to replaced it. *See Tyler v. Schoenherr*, 2012 WI App 97, ¶ 38, 344 Wis. 2d 124, 820 N.W.2d 156 (unpublished decision).

tions and may be found where the statute of limitations has not yet run."); *Haferman v. St. Clare Healthcare Found., Inc.*, 286 Wis. 2d 621, 647, 707 N.W.2d 853, 866 (2005) (noting that even when "the legislature has not provided a statute of limitations … the affirmative defense of laches remains available in an appropriate case"). But the district court concluded that laches was an issue for trial. *See CMFG*, 2014 WL 3696233, at *24 (holding that that "laches [was] best left for trial" because a reasonable factfinder "could conclude that CUNA Mutual's delay, while acquiring the information necessary to make its claims against RBS plausible, was reasonable under the circumstances"). The merits of this defense thus are not before us in this appeal.

**B. Material Misrepresentations**

Having concluded that CUNA's rescission claims are not time-barred, we turn to the merits of the claims. Under Wisconsin law, "[t]o rescind a contract based on a fraudulent or material misrepresentation made during contract formation, the recipient must have justifiably relied on the misrepresentation in deciding to enter into the contract." *Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1106 (7th Cir. 2014) (citing *Notte*, 97 Wis. 2d at 222, 293 N.W.2d at 538). "The reliance inquiry thus involves two subsidiary questions: (1) Did the party actually rely on the misrepresentation? (2) If so, was the reliance justifiable?" *Id.*

As we recently noted, "[t]he Wisconsin Supreme Court has not addressed the standard that governs [the actual reliance] aspect of a fraudulent-inducement claim." *Id.* Based on relevant Wisconsin precedent, we predicted that Wisconsin would follow the Restatement (Second) of Contracts. *Id.* Under this approach, a person actually relies on a misrepresen-

tation if the misrepresentation "*substantially contributes* to his decision to manifest his assent." *Id.* (citing Restatement (Second) of Contracts § 167 (1981)). "Substantially contributes" is a less demanding standard than "'but for,' 'sole,' or even 'predominant,' causation." *Id.* The party asserting fraudulent inducement must also show that the representation was material to his or her decision. *Id.* at 1107. "A misrepresentation is material if it is likely to induce a reasonable person to manifest his assent, or if the maker knows that it is likely that the recipient will be induced to manifest his assent by the misrepresentation." *Notte,* 97 Wis. 2d 207 at 222–23, 293 N.W.2d at 538.

CUNA argues that it relied on two types of representations: RBS's written representations that the loans underlying its securities complied with underwriting guidelines, and RBS's oral representations that it performed due diligence on every deal to confirm guidelines compliance. RBS contests actual reliance. We address each representation in turn.

### 1. Written Representations of Guidelines Compliance

CUNA contends that Prusha relied on written representations contained in the prospectuses. All of the base prospectuses represent that the underlying loans will have been originated in compliance with underwriting guidelines. All of the prospectus supplements also represent that the loans comply with underwriting guidelines, and they provide detail about the originators' underwriting standards. Although there are variations among the representations, they all unequivocally state that the loans will comply with underwriting guidelines of some kind.

The parties do not dispute the existence and content of the prospectus representations. What they do dispute, however, is whether Prusha actually relied on these representations in deciding to purchase the securities at issue. In fact, Prusha could not specifically recall reading the prospectus representations. For five of the ten deals, Prusha made an initial commitment to purchase before RBS provided the prospectus supplements.[6] For the remaining five deals, Prusha made an initial commitment to purchase after receiving the prospectus supplements, but he does not recall reading them; he could testify only that it was his habit and practice to do so. The district court concluded that Prusha did not actually rely on the written representations in deciding to purchase the securities. *CMFG*, 2014 WL 3696233, at *29–32.

On appeal, CUNA argues that Prusha need not have read the written representations to have relied on them. CUNA contends that Prusha "properly expected that RBS's prospectuses would represent guideline compliance" based on their course of dealing. Appellant's Br. at 35.

The Restatement of Contracts defines a course of dealing as "a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Restatement (Second) of Contracts § 223 (1981); *see also* Wis. Stat. § 401.303(2) (2010) (codi-

---

[6] In a sixth deal, RAMC 2005-4, Prusha also made his initial commitment to purchase before the prospectus supplement was provided to him. For this deal, however, Prusha had received a preliminary prospectus supplement. Accordingly, the district court did not include the deal in this category. *See CMFG*, 2014 WL 3696233, at *20.

fying section 223). "Course of dealing may become part of an agreement either by explicit provision or by tacit recognition, or it may guide the court in supplying an omitted term." *Id.* § 223 cmt. b.; *see also* Wis. Stat. § 401.303(4) (2010) ("[C]ourse of dealing between the parties … is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement."). Through their course of dealing, CUNA contends, RBS and CUNA reached an understanding that every prospectus supplement would include a written representation of guidelines compliance and that CUNA would not assent to a contract without this representation.

The transactions between CUNA and RBS took place in a broader market for residential mortgage-backed securities. Understanding how this market operated is essential to understanding the course of dealing between CUNA and RBS. In 2005, three industry associations—all of which count RBS as a member—submitted letters to the SEC commenting on "the SEC's proposed rules … for securities offering reform … as they relate[d] to asset-backed securities." App. at 2340; *see also* App. at 2275, 2368. These letters provide insight into how the market functioned at that time.[7]

The American Securitization Forum's letter to the SEC observes that "parties often forego the preparation of a preliminary prospectus prior to pricing and pricing is based on a term sheet alone." App. at 2311. This practice, the letter ex-

---

[7] RBS argues that these letters are inadmissible hearsay. But as discussed above with regard to the SEC final rule, CUNA's expert witness may testify based on these letters. *See supra* note 3; Fed. R. Evid. 703.

plains, is necessitated by the "fluid nature" of these transactions. App. at 2311. Thus, where "only a term sheet is delivered … any contract with investors is also subject to the condition that the more detailed terms of the offering set forth in the final prospectus are reasonably consistent with market customs and standards (or with prior issuances by the related depositor or its affiliates)." App. at 2313. Put another way, there is an "implied representation that the terms of the offering … will be reasonably consistent with market customs and standards or with prior issuances by the related depositor or its affiliates." App. at 2314. Because "it is difficult for investors to review and digest revisions to the information previously delivered at the time of pricing," moreover, issuers generally "notify investors that there is a material change that investors should be aware of." App. at 2316. The letter describes this as a "general view" in the industry, "reflect[ing] both widespread current practice and best practice." App. at 2312, 2320. Aware of these market norms, "[i]nvestors in many transactions for which only a term sheet is prepared prior to pricing … make their investment decision based on the issuer's reputation and their *prior course of dealing* with the related depositor, or based on market customs and standards for the asset class and transaction structure involved in the offering." App. at 2318 (emphasis added).

The Bond Market Association's letter to the SEC describes the market in nearly identical terms. The letter says that "long-standing practice" in the asset-backed securities market is that "to the extent the final prospectus contains material terms not described in the [p]reliminary [i]nformation, those material terms will be consistent with [asset-backed securities] market customs and standards or

prior similar transactions of the same depositor or an affiliated depositor." App. at 2348. Thus, "[i]f the underwriter believes that there are [m]aterial [c]hanges between the [p]reliminary [i]nformation and the final prospectus, current standard practice is to alert the investor prior to settlement and give the investor an opportunity to break the trade, or to agree to re-price the trade." App. at 2348. Likewise, the Mortgage Bankers Association's letter to the SEC says, "investors expect that … the final prospectus … will be consistent with market custom and standards as well as any prior dealings with the same depositor." App. at 2374. With regard to guidelines-compliance representations specifically, RBS's own expert testified that "representations and warranties about compliance with underwriting guidelines [were] standard, common and customary in the secondary mortgage market," and that "active, regular participants in the market understood these provisions to be a part of the foundational pieces enabling the transaction to go forward, supporting the economics of the transactions and specifically allocating risk." App. at 1565, 1571. Notably, RBS has not presented any evidence—from industry associations, experts, or otherwise—that contradicts these descriptions of how the mortgage-backed securities marketplace operated.

It is in this context that CUNA and RBS entered into the ten deals at issue in this case. Like other investors in this market, Prusha often made commitments to purchase on term sheets alone. He testified that he felt confident doing so because his decision was "conditional … on the understanding that any subsequent information I received would be consistent with generic information that is always included in the final prospectus supplements." App. at 1579, ¶ 13. That is, if "the generic information was materially different

from what was typically disclosed in prospectus supplements," Prusha understood that "RBS would contact [him] to make sure [he] still wanted to go through with the trade." App. at 1579, ¶ 13.

CUNA's evidence shows that Prusha's expectation was not only the predominant one in the market, but one that was urged by securities issuers—to both investors and the SEC. There is no evidence, furthermore, that RBS's course of dealing with CUNA was any different; specifically, there is no evidence that RBS ever deviated from these market norms. Every base prospectus and prospectus supplement between CUNA and RBS included written representations of guidelines compliance. RBS's head of mortgage trading and asset-backed finance testified that it was his "understanding of market practice" that an investor had "the right to break the trade" if there were "material changes between the preliminary information and the final prospectus." App. at 976. And, as we will discuss in greater detail below, Prusha testified that RBS repeatedly assured him that it performed due diligence on all deals brought to market. Based on this evidence, a reasonable factfinder could find that RBS's course of dealing with CUNA was consistent with prevailing market norms.

We now come to the issue presented on appeal: Could a reasonable factfinder also find that Prusha actually relied on the prospectus representations even though he had not read them in advance? Or does failure to read a contractual representation preclude actual reliance on that representation as a matter of law?

A person can come to know facts in any number of ways. Here, CUNA contends that Prusha came to know that RBS

made guidelines-compliance representations in its prospectuses through his course of dealing with RBS. CUNA alleges that its course of dealing with RBS included a common basis of understanding that any and all mortgage-backed securities agreements between them would contain a guidelines-compliance representation.

Based on CUNA's course-of-dealing evidence, we conclude that a reasonable factfinder could find that Prusha actually relied on the guidelines-compliance representations that he reasonably expected to be made in the prospectuses. CUNA and RBS's course of dealing took place in a market where guidelines-compliance representations were ubiquitous and understood to be "foundational pieces" of any deal. *See* App. at 1571. Industry practice, moreover, was to inform the investor if the final prospectus deviated from "market custom and standards" or the parties' "prior dealings." *See* App. at 2374. (Indeed, this practice was so entrenched that RBS's industry association told the SEC it amounted to an "implied representation" in any offering. *See* App. at 2314.) CUNA and RBS conducted over a dozen deals, each of which included the guidelines-compliance representation. RBS never told CUNA that any of their deals would deviate from market custom. To the contrary: Prusha testified that throughout their relationship, RBS repeatedly assured him that due diligence would be performed on every deal between them. That is effectively the same as saying that each deal would include the guidelines-compliance representation; as RBS's own policy manual states, the entire point of conducting due diligence was to minimize "legal and reputational exposure" from its representations about the characteristics of the underlying mortgages. *See* App. at 2522.

That is not to say, however, that a reasonable factfinder could find that Prusha relied on the prospectus representations down to the letter. For instance, if one of the prospectuses stated that Guideline X had been used when, in fact, Guideline Y had been used, and both guidelines complied with industry standards, CUNA could not sue RBS for materially misrepresenting that Guideline X had been used.[8] That's because Prusha does not recall reading the specific prospectuses at issue in this case; he thus could not have relied on a specific set of guidelines being used. A reasonable factfinder could find, however, that Prusha relied on a representation of compliance with guidelines that met industry standards. Exactly what this means—what Prusha would have understood about the prospectus representations through course of dealing and market custom—is an issue for trial, not summary judgment.

RBS argues that this amounts to misrepresentation by silence. The actual representation at issue, however, was written. CUNA does not argue that RBS's silence represented that the prospectus supplements contained guidelines-compliance representations when, in fact, they didn't. Nor could they: every prospectus supplement did contain the representation.

RBS also contends that Prusha "rel[ied] on his assumptions about what the documents might say," not the actual written representations. Appellee's Br. at 18. Thus, RBS con-

---

[8] It is undisputed that the originators did not all use the same underwriting guidelines. Def.'s Reply in Supp. of Def.'s Proposed Findings of Fact ¶ 52. CUNA emphasizes, however, that "all underwriting guidelines [were] meant to assess the ability of the borrower to repay the loan and the sufficiency of the collateral." *Id.*

tends, "[i]f CUNA purchased securities based on its assumptions, it did not act on representations made by RBS." *Id.* at 19. We disagree. CUNA does not contend that Prusha made an assumption about what the prospectuses contained that just happened to be correct. Rather, CUNA contends—and Prusha testified—that Prusha understood, via his course of dealing with CUNA, that the prospectuses contained the representations. If he understood, based on the parties' course of dealing, that the contract would contain a particular representation, a reasonable factfinder could determine that he did not have to read it immediately before signing in order to say that he relied on the representation, particularly when the contract *actually contained* the representation he understood would be there.

We wish to emphasize, however, the narrowness of our conclusion. We do not establish a rule that a party to a transaction may claim justifiable reliance on representations that were not made, or that he had not read. To the contrary, a party entering into a business transaction cannot do so based on assumptions and suppositions and then complain after the fact that they turned out to be unfounded. That would not constitute justifiable reliance. And indeed, the finder of fact in this case may conclude after a trial that CUNA has not proven reliance or at least not justifiable reliance. Our determination that the issue is reserved to the finder of fact in this case is premised on the relatively unusual situation laid out in Prusha's testimony—which we are required to take as true at the summary judgment stage—that his prior dealings with RBS warranted him in understanding that the representations that he knew had been made in the prior deals he had reviewed and that were established standards in the industry were also being made in the deals at issue.

Given that testimony, but only given that testimony, entry of summary judgment in RBS's favor was inappropriate.

In summary, a reasonable factfinder could find that Prusha actually relied on the prospectuses' guidelines-compliance representations. A reasonable factfinder could also find that the representations were material—that is, that they would induce a reasonable investor to enter the contract. There is ample evidence in the record that the guidelines-compliance representations were foundational to the deals at issue in this case. CUNA was thus entitled to a trial on these claims.

### 2. Oral Representations of Due Diligence

In its response to the motion for summary judgment, CUNA also contended that RBS represented to Prusha that it performed due diligence on every mortgage-backed securities deal. These representations, CUNA argued, are "independently actionable"—that is, they can support the rescission claim even without the prospectus representations. Pls.' Resp. to Def.'s Mot. for Summ. J. at 48. The district court ruled that CUNA inappropriately sought to add a new claim at summary judgment. *CMFG*, 2014 WL 3696233, at *17.

On appeal, CUNA argues that the due-diligence representations did not amount to a new claim. CUNA notes that both its first and second amended complaints alleged the due-diligence representations. Thus, CUNA contends, Prusha's "independent reliance" on the due-diligence representations are merely "a permissible view of the facts," not an amendment of its complaint. Appellant's Br. at 44.

The district court's ruling concerns how it read the complaint, not a decision to permit or deny leave to amend. Our

review is therefore de novo. *Cf. Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010) (district court's grant of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is reviewed de novo). As CUNA observes, both the first and second amended complaints alleged due-diligence representations. *See, e.g.*, First Am. Compl. ¶¶ 302–03; Second Am. Compl. ¶¶ 135–69, 306, 876. Accordingly, RBS was on notice that CUNA was asserting Prusha's reliance on the due-diligence representations (indeed, RBS deposed Prusha on precisely this question). The due-diligence representations are not a new claim; they are simply another factual basis for rescission based on misrepresentation of guidelines compliance. CUNA was entitled to refine its rescission theory at summary judgment based on evidence produced in discovery. *See Whitaker v. Milwaukee Cty.*, 772 F.3d 802, 807–09 (7th Cir. 2014) (argument raised on summary judgment was not improper "attempt to amend the pleadings" because plaintiff was merely "offer[ing] an alternative legal characterization of" a fact); *Rabe v. United Air Lines, Inc.*, 636 F.3d 866, 872 (7th Cir. 2011) ("A complaint need not identify legal theories … .").

Despite ruling that CUNA could not assert the due-diligence representations as an independent basis for rescission, the district court addressed this theory out of "an abundance of caution." *CMFG*, 2014 WL 3696233, at *17. The court acknowledged that "by advertising its underwriting procedures to potential buyers," RBS was effectively "vouching for the accuracy of the original underwriting data." *Id.* at *27. Thus, the court reasoned, the due-diligence representations could potentially serve as an independent basis for rescission based on misrepresentation of guidelines compliance. The court nevertheless concluded, however,

that Prusha's testimony about the due-diligence representations was "too vague to allow for the reasonable inference that any representations RBS made were material" because they "do not refer to 're-underwriting' or any other specifics regarding RBS's 'due diligence.'" *Id.* at *27–28. Lack of specificity," the court said, can render a statement so vague that "no reasonable investor could rely on it." *Id.* at *28. We must therefore also decide whether Prusha's recollection regarding RBS's due-diligence representations is specific enough to create a genuine dispute of fact.

Prusha testified that "RBS representatives repeatedly told me that RBS performed due diligence on every deal to ensure compliance with underwriting guidelines." App. at 1580, ¶ 15. RBS described this due diligence, Prusha alleged, as "a reunderwriting of loans according to the guidelines of the originator which includes doing valuation appraisals or … appraisal review … and other things that are part of due diligence." App. at 846; *see also* App. at 901 (testifying that he felt "comfortable [ ] because … RBS said they did due diligence on all deals and that they sampled all deals and … because they had the mathematicians and the quantitative personnel to determine what was a significant sample size"). Asked when he heard these representations, Prusha replied, "[i]t's in documentation that [RBS] did due diligence on every deal that they bring to market," and "I would talk about that with either Mike Carothers [one of RBS's salespeople] or others at conferences." App. at 847. Prusha also alleged that "RBS put on meetings themselves where they made presentations" about "their due diligence process." App. at 895; *see also* App. at 895 ("[W]e would have meetings with RBS and with originators. And … RBS would go through their due diligence process … ."). The district court ruled that this evi-

dence was insufficient to create a genuine dispute of fact because Prusha could not testify "as to when these statements were made, who made them and whether they were made in connection with these offerings," and because his descriptions of the statements lacked detail. *CMFG*, 2014 WL 3696233, at *28.

Prusha's recollection is thin on specifics. He attributes this, however, to the number of offerings that he reviewed. By the time Prusha did his first deal with RBS, he "had already purchased more than 100 [residential mortgage-backed securities] certificates" and had reviewed many more offers. App. at 1577, ¶ 8. Accordingly, Prusha testified, he could not remember specific details "because of the fact that I'm looking at deals on a daily basis … over the course of a 15 year career." App. at 899. In other words, Prusha says that he is unable to recall specific dates and locations because RBS's offers did not stand out from the hundreds—possibly thousands—of other offers he reviewed.

Although Prusha cannot recall when and where he heard the due-diligence representations, his recollection of their substance is corroborated by evidence produced in discovery. RBS produced internal policy manuals stating that due diligence was to be performed on all asset-backed securitizations. *See, e.g.*, App. at 2522. RBS also produced slides from presentations that were delivered to investors in 2004, 2006, and 2007. These presentations uniformly state that "[a]ll whole loan pools are re-underwritten," "each loan undergoes a full [due diligence] review" using random sampling, and that RBS "has followed consistent strategies for due diligence for whole loan trades." *See, e.g.*, App. at 1983, 1990, 1994. It is undisputed, moreover, that RBS actually discussed

its due diligence procedures in these presentations. *See* App. at 1929 (stating that presentation was "something we've sent to investors in the past," and that RBS's head of due diligence typically talked potential investors through the due diligence slides); App. at 982–93 ("We certainly discussed our loan file diligence procedures with investors … [t]o let them know that we had done the appropriate amount of work to ensure that what we had presented to them in the prospectus was accurate."); App. at 1884 ("I found myself repeating with investors [that] … we perform extensive loan file and appraisal diligence … ."). It is true that CUNA has not produced evidence tying Prusha to one of these documented presentations. But these presentations are offered as corroborating evidence, not misrepresentations in their own right. And, notably, all of the evidence on this issue points in the same direction; RBS has not pointed to any evidence of investor presentations that did not include representations of due diligence.

We conclude that CUNA's evidence is sufficient to preclude entry of summary judgment. There are, to be sure, deficiencies in Prusha's testimony. But Prusha's plausible explanation for these deficiencies, as well as the evidence corroborating the substance of his testimony, is enough to get past summary judgment. The deficiencies go to weight, a matter appropriately addressed by the factfinder at trial. Moreover, there is ample evidence in the record that the due diligence described by Prusha was essential to evaluating the riskiness—and, accordingly, the price—of the securities. A reasonable factfinder therefore could find that the due-diligence representations were material.

The district court also ruled that the due-diligence representations were non-actionable puffery as a matter of Wisconsin law. *CMFG*, 2014 WL 3696233, at *28. We disagree.

The touchstone case is *United Concrete & Const., Inc. v. Red-D-Mix Concrete, Inc.*, 349 Wis. 2d 587, 836 N.W.2d 807, 816 (2013). In *United Concrete*, the plaintiff had terminated its relationship with a concrete supplier when it encountered a specific, technical problem with the concrete—excessive bleed water. *Id.* at 594, 836 N.W.2d at 810–11. The plaintiff later contacted the concrete company about restoring their business relationship, and the concrete company represented that the bleed water problem had been resolved. *Id.* at 594, 836 N.W.2d 811. In fact, however, the concrete remained defective. *Id.* at 595, 836 N.W.2d 811.

The Wisconsin Supreme Court held that these representations did not amount to non-actionable puffery. Puffery, the court explained, is an "exaggeration[] reasonably to be expected of a seller as to the degree of quality of his product, the truth or falsity of which cannot be precisely determined." *Id.* at 605, 836 N.W.2d at 816. Such exaggerations "do not subject the speaker to liability … because they convey only the seller's opinion and are not capable of being substantiated or refuted." *Id.* Excessive bleed water, by contrast, "is a technical problem, with a technical definition and a technical solution." *Id.* Indeed, both parties had "retained experts who undertook extensive investigations into the *precise* composition of the concrete used in the relevant properties, and then submitted elaborate reports on that composition." *Id.* at 605–06, 836 N.W.2d at 816. Thus, the court concluded, there was "nothing in the record to suggest that a trier of fact, properly instructed and assisted by expert tes-

timony, would be unable to ascertain whether [the defend-ant] used an acceptable combination of ingredients in its concrete or did not." *Id.* at 606, 836 N.W.2d at 816.

In this case, a reasonable factfinder could find that the due-diligence representations were not puffery. Under cer-tain circumstances, a general representation of due diligence could be puffery. There is evidence, however, that in the mortgage-backed securities market, this representation car-ried a very specific meaning: due diligence that was ade-quate to ensure guidelines compliance (generally by means of statistically-significant loan sampling). Like the represen-tations in *United Concrete*, guidelines compliance involves "a technical problem, with a technical definition and a technical solution." *Id.* at 605, 836 N.W.2d at 816. Such representations do not amount to non-actionable puffery.

The cases cited by RBS and the district court are distin-guishable. Only one comes from Wisconsin, and it involved a vague superlative that could not be verified as true or false. *See Tietsworth v. Harley-Davidson*, Inc., 270 Wis. 2d 146, 172, 677 N.W.2d 233, 246 (2004) (advertisement claimed that mo-torcycle engine was a "masterpiece" of "premium quality"). The case from our circuit is distinguishable for the same rea-son. *See Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995) ("[T]he phrase 'recession-resistant' is simply too vague to constitute a material statement of fact. Plaintiffs apparently interpret the phrase to mean 'recession-proof.' But it could be just as easily used to describe a company that although not impervious to the effects of a recession will nevertheless survive it better than others. It is a promotional phrase used to champion the company but is devoid of any substantive information.").

The remaining cases that RBS cites are out-of-circuit cases. Although four of these cases involved representations about due diligence, they are not instructive here. In two of the cases, the due-diligence representation was vague and undefined. *See ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 205–06 (2d Cir. 2009) (statements that company had "risk management processes [that] are highly disciplined and designed to preserve the integrity of the risk management process" and that company "set the standard for integrity," were puffery (internal quotation marks omitted)); *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 297 (S.D.N.Y. 2013) (concluding that "very detailed," "in-depth," and "exhaustive" were "rosy but general portraits of [defendant's] due diligence" and therefore puffery, but acknowledging that "representations about due diligence anchored in specific factual claims may be actionable"). Here, by contrast, there is evidence that both parties understood the due-diligence representations to have a definite meaning that conveyed specific facts about the securitization process and underlying loans. In the third case, the court held that reliance on the due-diligence representation was unjustifiable for reasons that are irrelevant here. *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003) (holding that "a rational investor would not have relied on the due diligence statements contained in the prospectus" because the prospectus warned that the company "had not yet assumed operations" and provided nine pages of risk disclosures, including risks that the defendant allegedly misrepresented). And in the last case, the district court held that a statement that "representatives from the two banks met and discussed, among other things, 'due diligence matters generally'" was not actionable

because it was true. *See Lighthouse Fin. Grp. v. The Royal Bank of Scot. Grp., PLC,* 902 F. Supp. 2d 329, 341 (S.D.N.Y. Sept. 28, 2012). Here, by contrast, there is evidence that RBS's due-diligence representations were false.[9]

Finally, RBS observes that the presentations "noted that the material was informational, was not intended as an offer to buy or sell securities, and that 'no representation or warranty, whether express or implied, is made and no liability or responsibility is accepted … as to the accuracy or completeness thereof." Appellee's Br. at 23–24. As CUNA notes, however, the presentations also contained prefatory language stating that "[t]he information contained in these materials is believed to be reliable." *See, e.g.,* App. at 494. And, in any event, CUNA's due diligence claim is not based on the presentations; it is based on Prusha's testimony. The presentations are offered simply as corroborating evidence.

In sum, the due-diligence representations are independently actionable, and CUNA's claim based on them must proceed to trial.

---

[9] In a footnote, RBS argues that if it "made a general representation regarding how it would conduct its due diligence process on future offerings, that would be a non-actionable statement of future events." Appellee's Br. at 23 n.11. As presented by Prusha, however, the due-diligence representations were not statements of future events; they were statements of fact about RBS's process for creating mortgage-backed securities. The due-diligence representations at issue here are therefore different from those in the case cited by RBS, which involved a promise to perform a future action in a one-off transaction. *See Badger Pharmacal, Inc. v. Colgate-Palmolive Co.,* 1 F.3d 621, 626 (7th Cir. 1993) (defendant's promise to "launch a national advertising and marketing campaign" was "promissory in nature" and thus did not "relate to present or preexisting facts").

### 3. Disclaimers

In four of the ten deals at issue in this case, the prospectus supplements contained liability disclaimers. These disclaimers stated that guidelines-compliance information was provided by the originator and that RBS did not vouch for the accuracy or completeness of such information. CUNA moved for partial summary judgment on these disclaimers, arguing that they were void under federal law. Because the district court granted summary judgment for RBS on other grounds, it denied CUNA's motion as moot. *CMFG*, 2014 WL 3696233, at *32. The district court noted, however, that the remaining prospectuses "include[d] statements to the effect of: 'The information set forth in the following paragraphs has been provided by the originator.'" *Id.* The district court ruled that no reasonable factfinder could "find that RBS independently made representations that the originators had complied with their underwriting guidelines" because the latter statements establish "that the originators, not RBS, actually made the representations at issue, and that [RBS] was simply passing along the information." *Id.* The district court acknowledged that "if RBS actually told CUNA Mutual that *it* had re-underwritten the loans to ensure compliance with guidelines [i.e. represented that it had performed due diligence], then a reasonable factfinder could conclude that RBS was making those same representations." *Id.* Because the district court ruled that Prusha's testimony was too vague to make these representations actionable, however, it concluded that they were also "not enough to keep CUNA Mutual's claim based on compliance with underwriting guidelines alive." *Id.*

The district court's ruling on the originators' guidelines-compliance representations was predicated on its ruling on the due-diligence representations. Because we have reversed the district court's ruling on the due-diligence representations, we also reverse the district court's ruling that no reasonable factfinder could find that RBS "independently made representations that the originators had complied with their underwriting guidelines." *Id.*

Although this alone is grounds for reversal, we think that a reasonable factfinder could find that RBS vouched for the originators' guidelines-compliance representations even without the due-diligence representations. To begin, the offering documents came from RBS, included the RBS logo, and were drafted by RBS. One could infer from this that RBS was making the representations contained in the documents. It is true that the offering documents state that the originators provided the guidelines-compliance information and do not state that RBS vouches for this information. One possible interpretation of these statements, then, is that RBS simply intended to convey information it had received from the originators, not represent that this information was accurate. But the prospectus supplements did not disclaim the accuracy of this information either—even though other RBS prospectuses *did* disclaim the accuracy of this information. Thus, another possible interpretation is that by excluding the disclaimers, RBS intended to represent (and CUNA understood RBS to be representing) that the guidelines-compliance information was accurate.

RBS's response to an SEC letter regarding express disclaimers supports the latter interpretation. In 2006, the SEC sent a letter to RBS that said the following: "[D]isclaimers of

liability for material information provided by the issuer or underwriters or any of their affiliates is not appropriate. Please revise the disclaimers mentioned above, and delete any other similar disclaimers in the prospectus." App. at 541. Elsewhere in the letter, the SEC reminded RBS that it was "responsible for the accuracy and adequa[c]y of the disclosures … made [in the base and supplemental prospectuses]" because "its management are in possession of all the facts relating to [its] disclosure[s]." App. at 543.

The original language in RBS's prospectus supplement read as follows:

> The Mortgage Loans were originated or purchased by [_____] (either directly or through affiliates) from mortgage loan brokers or originated by its retail division, generally in accordance with the underwriting criteria described herein. The information set forth in the following paragraphs has been provided by [_____], and none of the Depositor, the Servicer, the Sponsor, the Indenture Trustee, the Underwriter or any other party makes any representation as to the accuracy or completeness of such information.

App. at 558. After receiving the SEC's letter, RBS agreed to remove the disclaimer. The final language, approved by the SEC, read as follows:

> The Mortgage Loans were originated or purchased by [_____] (either directly or through affiliates) from mortgage loan brokers or originated by its retail division, generally in accord-

ance with the underwriting criteria described herein. The information set forth in the following paragraphs has been provided by [_____].

*Id.* at 588. Given this drafting history, it does not appear that RBS viewed the second sentence as a disclaimer of the information's accuracy.

A reasonable factfinder could find that, by providing the guidelines-compliance representation in the prospectus supplements and excluding express disclaimers of the information's accuracy, RBS intended to vouch for the information. Thus, even without the due-diligence representations, a reasonable factfinder could find that RBS represented that the originators had complied with their underwriting guidelines.

### C. Leave to Amend

The district court denied CUNA's motions to amend the complaint to add claims for rescission based on mutual mistake and intentional misrepresentation. *See CMFG Life Ins. Co. v. RBS Sec. Inc.*, No. 12-CV-037-WMC, 2013 WL 4483068, at *18 (W.D. Wis. Aug. 19, 2013); *CMFG*, 2014 WL 3696233, at *36–37. CUNA appeals these rulings.

Both motions were filed after the district court's deadline to amend the pleadings of April 20, 2012. The motion to add the mistake claim was filed one year after the amendment deadline (on April 12, 2013); the motion to add the intentional misrepresentation claim was filed over two years after the deadline (on July 14, 2014). "To amend a pleading after the expiration of the trial court's [s]cheduling [o]rder deadline to amend pleadings, the moving party must show 'good cause.'" *Trustmark Ins. Co. v. Gen. & Cologne Life Re of Am.*,

424 F.3d 542, 553 (7th Cir. 2005). In making this determination, "the primary consideration … is the diligence of the party seeking amendment." *Alioto v. Town of Lisbon*, 651 F.3d 715, 720 (7th Cir. 2011).

CUNA does not argue good cause on appeal. Instead, CUNA argues unfairness, pointing to the fact that the district court excused RBS's delay in asserting the statute of limitations defense. But a court need not excuse one party's delay simply because it excused the other's. Here, the district court believed it was compelled to excuse RBS's delay by *King v. Kramer*, 763 F.3d 635 (7th Cir. 2014). In that case, we held that delay alone is insufficient to justify trying a case "under the incorrect legal standard, when all parties and the court are aware of the correct standard."[10] *Id.* at 644. *King* does not apply to CUNA's motions to amend, however, and the court provided reasoned bases for denying them. With regard to the mistake claim, the district court held that CUNA had failed to "convincingly explain why an argument based upon mistake could not have been added to the original complaint—or at least proposed as an amendment in response to RBS's motion to dismiss filed a full year earlier than its request to amend." *CMFG*, 2013 WL 4483068, at *18. With regard to the intentional misrepresentation claim, the district court concluded that CUNA's delay was "too long" and "highly prejudicial" because "[b]elieving that its intent was not at issue, RBS has proceeded to litigate this case based on other grounds." *CMFG*, 2014 WL 3696233, at *37. Thus, the district court concluded, "[t]o allow CUNA Mutual to aban-

---

[10] Although we have reversed the district court on this point, the court believed section 893.43 to be the correct statute of limitations at the time.

don the need to prove materiality, in favor of proving knowledge and intent to defraud, would either substantially alter the course of trial or effectively deny RBS the opportunity (and certainly the reason) to take discovery on an intent-based theory and/or attack CUNA Mutual's purported fraud claims at summary judgment." *Id.* The district court did not abuse its discretion by denying leave to amend.

### D. Circuit Rule 36

CUNA asks us to invoke Circuit Rule 36 on remand. Rule 36 requires that a case be assigned to a different judge when "we reverse a judgment entered after a trial and remand for a new trial." *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1463 (7th Cir. 1994). We have also invoked Rule 36 "to avoid the operation of bias or mindset which seems likely to have developed from consideration and decision of motions to dismiss or motions for summary judgment and the like." *Cange v. Stotler & Co.*, 913 F.2d 1204, 1208 (7th Cir. 1990). CUNA argues that bias is shown because the district court "has already weighed Prusha's credibility and rejected the course-of-dealing evidence." Appellant's Br. at 54.

We decline to invoke Rule 36. Chief Judge Conley has demonstrated impartiality in his handling of this case, even if we have overturned some of his rulings. It is true that he noted a "glaring inconsistency" in Prusha's testimony (and questioned whether trial was required to assess his credibility on this point), *see CMFG*, 2014 WL 3696233, at *32, but this isolated comment does not evidence bias.

### III. Conclusion

For the reasons stated above, we reverse in part and affirm in part. We REVERSE the district court's grant of RBS's

motion for summary judgment. We AFFIRM the district court's denial of CUNA's motions for leave to amend.