Oleg **KOSTOVETSKY, individually and on behalf of all others similarly situated, Plaintiff,**

v.

**AMBIT ENERGY HOLDINGS, LLC, Ambit Midwest, LLC, Ambit Texas, LLC, Ambit Northeast, LLC, Ambit New York, LLC, Ambit Marketing, LLC, Ambit Illinois, LLC, Ambit California, LLC, Ambit Holdings, LLC, Ambit New Jersey, LLC, Ambit Management, Inc., Ambit Group, L.P., Ambit Systems, Inc., Jere Thompson, Jr., Chris Chambless, and John Does 1–100, Defendants.**

15 C 2553

United States District Court, N.D. Illinois, Eastern Division.

Signed March 10, 2017

Mark Thomas Vazquez, Steve W. Berman, Andrew James Gordon, Daniel J. Kurowski, Elizabeth A. Fegan, Hagens Berman Sobol Shapiro LLP, Chicago, IL, for Plaintiff.

Nylin Jennifer Meghan Nylin, Michael W. Stockham, Stephen C. Rasch, Thompson & Knight LLP, Dallas, TX, Michael D. Sher, Neal, Gerber & Eisenberg, Chicago, IL, for Defendants.

### MEMORANDUM OPINION AND ORDER

Gary Feinerman, United States District Judge

Oleg Kostovetsky alleges in this putative class action that Jere Thompson, Jr., Chris Chambless, Ambit Energy Holdings, LLC, Ambit Illinois, LLC, and several other Ambit entities (collectively, "Ambit"), along with 100 unnamed Ambit consultants, perpetrated a scheme to defraud him and thousands of other natural gas customers in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and state unjust enrichment law. Doc. 1. Kostovetsky alleges that Ambit and one of its consultants duped him into signing up for Ambit Illinois's services by fraudulently promising savings on his gas bill, when in fact he ended up paying much higher prices to Ambit Illinois than he would have paid to his former provider.

Earlier in the litigation, the court denied Ambit's motion to dismiss. Docs. 64–65 (reported at 2016 WL 105980 (N.D. Ill. Jan. 8, 2016)). Ambit now moves for summary judgment. Doc. 67. On the day Kostovetsky filed his summary judgment response, his attorneys moved on behalf of

Amanda Argentieri, an Ambit customer from New York, to intervene as a party plaintiff. Doc. 105. Along with its summary judgment reply, Ambit filed a motion to strike arguments in Kostovetsky's summary judgment response that it believes press theories of liability not pleaded in his complaint. Doc. 131.

Meanwhile, three other Ambit customers—Taurshia Simmons, Brian Whitney, and Navid Kalatizadeh, who will be called "the *Simmons* Plaintiffs"—moved to intervene for the limited purpose of opposing Argentieri's intervention motion. Doc. 152. The *Simmons* Plaintiffs are the named plaintiffs in *Simmons v. Ambit Energy Holdings, LLC*, Index No. 503285/2015, 2017 WL 1196941 (N.Y. Sup. Ct., Kings Cnty., filed Mar. 23, 2015), a putative class action against Ambit entities in New York state court. Doc. 156–1 (reproducing the operative complaint in *Simmons*). They maintain that allowing Argentieri, a putative class member in *Simmons*, to become a plaintiff-intervenor here could impair their suit.

For the following reasons, Ambit's summary judgment motion is granted, its motion to strike is denied, Argentieri's motion to intervene is denied, and the *Simmons* Plaintiffs' motion to intervene is denied as moot.

## Background

The following facts are set forth as favorably to Kostovetsky as the record and Local Rule 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). On summary judgment, the court must assume the truth of those facts, but does not vouch for them. *See Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015).

Certain Illinois natural gas consumers, including those served by Nicor Gas, have the option of contracting for gas service with an alternative gas supplier rather than their local utility. Doc. 134 at ¶ 1; *see also Natural Gas Choice*, Illinois Commerce Commission, https://www.icc.illinois.gov/ags/consumereducation.aspx (last visited Mar. 8, 2017). Ambit Illinois is one such alternative supplier. Doc. 103 at ¶ 1. Like other Ambit entities, Ambit Illinois relies on salespeople it calls "Independent Consultants" to find and enroll new customers. *Id.* at ¶¶ 2–3. In trainings for its consultants and on its website, Ambit Illinois emphasizes potential consumer savings and its "competitive" low rates. Doc. 134 at ¶¶ 3–12.

Kostovetsky was a Nicor customer until late June 2013, when an Ambit consultant persuaded him to switch to Ambit Illinois. *Id.* at ¶¶ 28–30. As Kostovetsky understood the sales pitch, the consultant promised that, "no matter what," Ambit Illinois would charge him a lower rate than Nicor and he would save money by switching. Doc. 100–16 at 10–11; Doc. 134 at ¶ 30. (Defendants lodge a hearsay objection to Kostovetsky's testimony about what the consultant told him. Doc. 132 at 5. The objection is overruled because the consultant's statements while pitching Ambit Illinois's services are admissible under Federal Rule of Evidence 801(d)(2)(C) and/or (D).) Specifically, Kostovetsky thought that, as an Ambit customer, he would be entitled to at least a one percent discount from Nicor's rates. Doc. 103 at ¶ 18.

Upon agreeing to enroll with Ambit Illinois, Kostovetsky gave the consultant his Nicor bill, which was the only information the consultant requested to sign him up. Doc. 100–16 at 13; Doc. 134 at ¶¶ 31–32. On June 28, 2013, someone other than Kostovetsky—presumably the consultant—used Ambit Illinois's website to enroll him. Doc. 69–1 at 4 ¶ 15; Doc. 100–16 at 12; Doc. 103 at ¶ 4; Doc. 134 at ¶ 31. Shortly thereafter, someone other than Kostovetsky completed his enrollment on a

phone call that Ambit requires to verify new enrollments. Doc. 134 at ¶ 33.

Signing up via Ambit Illinois's website requires the customer's name, address, telephone number, and account number with his incumbent utility. Doc. 69–1 at 2 ¶ 5; Doc. 103 at ¶ 5. New customers enrolling through the website must also check a box acknowledging and accepting Ambit Illinois's terms of service, to which they are given a hyperlink. Doc. 69–1 at 2 ¶ 6; Doc. 103 at ¶ 6. Whoever signed up Kostovetsky must have checked the box. Doc. 69–1 at 2 ¶ 6; Doc. 103 at ¶ 6. That person also provided Kostovetsky's mailing address, which was accurate, and an e-mail address, "blooshi@aol.com," which was inaccurate. Doc. 100–16 at 19–21; Doc. 110 at ¶¶ 7, 22; Doc. 134 at ¶ 34.

On June 28, Ambit Illinois sent a welcome email, including a hyperlink to its terms of service, to the inaccurate email address. Doc. 69–1 at 2 ¶ 7; *Id.* at 8; Doc. 110 at ¶ 7. On June 30, Ambit Illinois sent a welcome letter to the accurate mailing address associated with Kostovetsky's account, enclosing a three-page document setting forth the terms of service. Doc. 69–1 at 3 ¶ 8; *id.* at 10–13; Doc. 103 at ¶ 8. Ambit has adduced evidence that Ambit Illinois mailed the June 30 letter containing the terms of service to Kostovetsky's mailing address and that the letter was not returned undelivered. Doc. 103 at ¶¶ 20–23. Although Kostovetsky has acknowledged that the address Ambit Illinois has on file for him is accurate, Doc. 69–2 at 2–3 ¶¶ 6–8; *id.* at 6; Doc. 69–3 at 2 ¶ 6; *id.* at 6; Doc. 100–16 at 21; Doc. 103 at ¶ 22, he testified at his deposition that he could not recall whether he received the June 30 letter, Doc. 100–16 at 21–22.

■ The parties disagree whether, on this record, there is a genuine factual dispute whether Kostovetsky received the June 30 letter. There is not. "[E]vidence of proper mailing raises a rebuttable pre-

sumption of delivery." *Laouini v. CLM Freight Lines, Inc.*, 586 F.3d 473, 476 (7th Cir. 2009); *see also Vincent v. City Colls. of Chi.*, 485 F.3d 919, 922 (7th Cir. 2007) ("Evidence of mailing is evidence of delivery."). If Kostovetsky had *denied* receiving the letter, his sworn denial would rebut the presumption for summary judgment purposes and create a factual dispute that the jury would need to resolve. *See Joshi v. Ashcroft*, 389 F.3d 732, 735 (7th Cir. 2004); *In re Longardner & Assocs., Inc.*, 855 F.2d 455, 459 (7th Cir. 1988). But that is not our situation. Kostovetsky's deposition testimony makes clear that he simply *cannot recall* whether he received the letter:

Q. Did you receive this letter [with the terms of service] in the mail from Ambit?

A. I don't remember.

Q. You just don't recall one way or the other?

A. I don't remember receiving this letter.

Q. I want to make sure I understand your testimony, Mr. Kostovetsky, and I'll let you know that Ambit's records reflect that the letter was mailed to you.

So my question is are you denying under oath that you received the letter?

A. I have no recollection of this letter.

Q. You have no recollection one way or the other?

A. One way or the other.

Doc. 100–16 at 21–22.

Unlike an outright denial, Kostovetsky's lack of recollection cannot rebut the presumption that he received the letter, and so there is no genuine factual dispute. *See Boomer v. AT&T Corp.*, 309 F.3d 404, 415 n.5 (7th Cir. 2002) (explaining that the plaintiff did not "present any conflicting evidence" regarding his receipt of a properly addressed mailing, as he "[did] not

contend that he did not receive the mailing—just that he does not remember receiving it"); *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735–36 (7th Cir. 2002) (holding that the non-movant's assertion "only that she does not remember receiving or seeing" a brochure containing the terms of her employment, where other evidence showed that the brochure was "definitely sent and presumably received," did not create a genuine factual issue over whether she received it); *Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1287 n.13 (11th Cir. 2003) ("The fact that neither [the non-movant] nor another employee remember receiving the policy (as opposed to being able to definitely testify that they never received it), is not particularly probative of whether [the non-movant] did in fact receive a copy of the policy."); *Bixler v. Cent. Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1301 (3d Cir. 1993) (holding that there was no genuine factual dispute concerning the non-movant's receipt of a mailed notice where she did not "recall having seen it" but admitted "it was properly sent to ... the correct mailing address"); *Pohlman v. NCR Corp.*, 2013 WL 3776965, at *5 (N.D. Ill. July 17, 2013) ("Pohlman's statements that he does not recall seeing or receiving the ACT brochure and letter fail to rebut the presumption that the mailed offer was delivered."); *Spivey v. Adaptive Mktg., LLC*, 660 F.Supp.2d 940, 947–48 (S.D. Ill. 2009) (holding that where the plaintiff could say only that he had "no recollection, no record of receiving" a document mailed to his proper address, "the Court must presume that [he] received the mailing"). The unrebutted evidence thus shows that Kostovetsky did receive the June 30, 2013 mailing containing the terms of service.

Ambit Illinois began supplying gas to Kostovetsky on July 19, 2013. Doc. 103 at ¶ 9. Initially, he was enrolled in Ambit Illinois's "Guaranteed Savings Plan." *Id.* at ¶ 11. Ambit Illinois's terms of service provided that they were "the entire Agreement between Ambit Energy and Customer," that "any previous agreements or oral statements are null and void," and that the customer "did not rely on any oral representations" that contradict the terms of service. *Id.* at ¶ 13. Regarding the Guaranteed Savings Plan, the terms of service explained:

> The price for all energy sold under this Agreement for the first two billing cycles shall be set based upon a five percent (5%) discount to the incumbent utility's published supply rate .... Thereafter, your supply rate will be set at a competitive variable market rate that will result in an annual savings of at least one percent (1%) ... to what the incumbent utility's published supply rates for the same 12–month period that you received power from Ambit Energy under this Agreement would have provided.

*Id.* at ¶ 12. They added:

> *At the end of each 12 month period, you must renew your Guaranteed Savings Plan to continue to receive the 1% annual savings guarantee.* You may renew online by logging onto your account management site at www.ambitenergy.com, calling customer care at (877) 282–6248, or by faxing your request to renew your plan to (214) 969–5928. ... *If Ambit Energy does not receive a request to renew your plan, your service will continue on the Illinois Select Variable Natural Gas plan.*

*Id.* at ¶ 19 (emphases added). Ambit Illinois imposed this renewal requirement on the Guaranteed Savings Plan sometime in 2012, before Kostovetsky enrolled. Doc. 134 at ¶ 16.

Kostovetsky's switch from Nicor to Ambit generated the promised savings, at least initially. During his first thirteen months as an Ambit customer, while en-

rolled in the Guaranteed Savings Plan, he paid a total of $586.90. Doc. 103 at ¶ 14. Ambit contends that Kostovetsky would have paid $605.38 to Nicor during the same period, a savings of 3.05 percent. Doc. 69 at ¶¶ 15–16. Kostovetsky disputes that figure, pointing to what he believes are discrepancies between the Nicor rates used in Ambit's calculation and the monthly rates that Nicor published, though he nowhere specifies how much (or little) he believes he actually would have paid Nicor that year. Doc. 103 at ¶¶ 15, 16; Doc. 134 at ¶ 38. Ambit persuasively explains—with evidentiary support—that any apparent discrepancy reflects its use of weighted averages of daily rates to calculate Nicor charges, not the published monthly rates on which Kostovetsky relies, and Kostovetsky offers no evidence to the contrary. Doc. 133 at 103–04; Doc. 134 at ¶ 38. In fact, he testified that Ambit delivered what its consultant had promised, and that he had no complaints, through August 2014. Doc. 100–16 at 27. The court therefore credits Ambit's uncontroverted account of Kostovetsky's savings during that first year.

When updating the terms of service in June 2014, Ambit added the following sentence regarding the Guaranteed Savings Plan: "A renewal notice will be sent to you prior to your Guaranteed Savings Plan expiration." Doc. 69–1 at 16. On June 20, 2014, Ambit sent Kostovetsky a letter by first class mail notifying him of the need to renew the Guaranteed Savings Plan and attaching the updated terms of service. *Id.* at 3–4 ¶¶ 9, 17; *id.* at 15–18; Doc. 103 at ¶ 20. Kostovetsky cannot recall whether or not he received that letter. Doc. 100–16 at 25–26; Doc. 103 at ¶ 20. For the reasons given above as to the original terms of service mailed on June 30, 2013, Kostovetsky's testimony on this point fails to create a genuine factual dispute, and the court therefore concludes that he received the June 20, 2014 letter as well. *See Boomer,*

309 F.3d at 415 n.5; *Tinder,* 305 F.3d at 735–36.

When Kostovetsky failed to renew his Guaranteed Savings Plan, Ambit Illinois switched him to the Select Variable Natural Gas Plan, effective sometime in August 2014. Doc. 69–1 at 15 (identifying August 4 as the expiration date of his enrollment in the Guaranteed Savings Plan); Doc. 134 at ¶¶ 44–45 (identifying August 18 as the end of the last billing period for which Kostovetsky experienced savings). The terms of service governing the Select Variable Natural Gas Plan read, in their entirety: "By choosing the Illinois Select Variable Natural Gas Plan, you will receive a competitive month-to-month variable rate plan." Doc. 69–1 at 11. That provision remained unchanged in the June 2014 update. *Id.* at 16. Ambit trained its consultants to tell customers who inquired about rollover that the Select Variable Natural Gas Plan was a "competitive, variable, month-to-month plan" and that customers "can, at any time, go back to the 1% Savings guarantee" by re-enrolling in the Guaranteed Savings Plan. Doc. 104–10 at 2; Doc. 134 at ¶ 22.

At the time Kostovetsky rolled over to the Select Variable Natural Gas Plan, Ambit Illinois was charging customers much higher rates on the Select Variable Natural Gas Plan than on the Guaranteed Savings Plan, which continued to track Nicor's rates. Doc. 134 at ¶¶ 39, 41, 43. Specifically, during the last billing period before Kostovetsky rolled off the Guaranteed Savings Plan, Ambit Illinois charged him $0.67 per therm, while Nicor would have charged him $0.68 per therm. *Id.* at ¶ 44. But during the first full billing period after Kostovetsky rolled onto the Select Variable Natural Gas Plan, Ambit Illinois charged him $1.01 per therm, while Nicor would have charged him $0.68 per therm. *Id.* at ¶ 45.

The large spread between the Select Variable Natural Gas Plan rates and Nicor's rates was, at the time Kostovetsky rolled over, a relatively new state of affairs; from roughly 2011 until roughly January 2014, the Select Variable Natural Gas Plan's rates closely tracked, and were only slightly higher than, the Guaranteed Savings Plan's rates, and thus were comparable to Nicor's rates. *Id.* at ¶¶ 39, 43. But once the Select Variable Natural Gas Plan's rates spiked, they remained much higher than the Guaranteed Savings Plan's rates and Nicor's rates throughout 2014 and 2015. *Id.* at ¶¶ 39, 42. During a billing period spanning December 2014 and January 2015, Kostovetsky paid more than double what Nicor would have charged him. *Id.* at ¶ 46. Other Ambit customers in Illinois and elsewhere who did not renew their Guaranteed Savings Plans or equivalent plans noticed similar spikes in 2014 and 2015. Docs. 100–18, 100–19, 100–20, 100–22, 100–24. (Ambit has various evidentiary objections to the declarations submitted by other Ambit customers. Doc. 132 at 5–8. Only a few of those objections have merit, and putting aside the objectionable material does not negate the overall thrust of the declarations, so there is no need to discuss Ambit's specific objections here.)

On January 26, 2015, upset with his skyrocketing energy bill, Kostovetsky called to cancel his service with Ambit Illinois. Doc. 103 at ¶ 26. That phone call was the first time that Kostovetsky complained to Ambit Illinois about its rates. *Id.* at ¶ 25. During the phone call, Kostovetsky confirmed that the mailing address Ambit Illinois had on file for him was correct. Doc 69–2 at 2–3 ¶¶ 6–8; *id.* at 6.

## Discussion

### I. Ambit's Motion to Strike and Summary Judgment Motion

■ Ambit has moved to strike several arguments in Kostovetsky's summary judgment response, asserting that those arguments press new theories of liability not fairly encompassed by the complaint. Doc. 131. Ambit is right that a plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012); *see also Griffin v. Potter*, 356 F.3d 824, 830 (7th Cir. 2004); *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002). Ambit is wrong, however, to contend that Kostovetsky has attempted any such maneuver here.

■ A plaintiff opposing summary judgment may not inject "new and drastic factual allegations," but instead must adhere to the complaint's "fundamental factual allegation[s]." *Whitaker v. Milwaukee Cnty.*, 772 F.3d 802, 808 (7th Cir. 2014); *see also Pine Top Receivables of Ill., LLC v. Banco de Seguros del Estado*, 2016 WL 3058339, at *10 (N.D. Ill. May 31, 2016) (holding that the plaintiff's argument in opposition to summary judgment exceeded the scope of the complaint, as "the existing factual allegations" in the complaint were "inconsistent with the new factual allegation" in the summary judgment response). *Grayson* illustrates the point. The plaintiff there alleged in an EEOC charge and then in his complaint that he was disciplined in retaliation for opposing discrimination against his *coworker*, but at summary judgment he maintained for the first time that he had actually been retaliated against for complaining to the EEOC about discrimination against *him*. 308 F.3d at 814–15, 817. The Seventh Circuit held that this new and different retaliation charge exceeded the scope of the complaint and thus could not be asserted on summary judgment. *Id.* at 817; *see also Whitaker v. T.J. Snow Co.*, 151 F.3d 661, 663–64 (7th Cir. 1998) (where the plaintiff, in opposing summary judgment, tried to switch from a strict products liability theo-

ry to a negligence theory); *Auston v. Schubnell*, 116 F.3d 251, 255 (7th Cir. 1997) (where the plaintiff pressed a promissory estoppel claim at summary judgment even though the complaint alleged only Title VII discrimination and breach of contract).

■ At the same time, a plaintiff has latitude to refine and develop his legal and factual theories based on the record that emerges in discovery. *See CMFG Life Ins. Co. v. RBS Sec., Inc.*, 799 F.3d 729, 743 (7th Cir. 2015) ("CUNA was entitled to refine its rescission theory at summary judgment based on evidence produced in discovery."). This latitude is in keeping with Rule 8(a)'s notice pleading regime, under which "[a] complaint need not identify legal theories." *Id.* at 744. For example, in *CMFG*, a purchaser of defective mortgage-backed securities sued the underwriter who sold them, alleging in its complaint that the underwriter "induced it to purchase the securities by materially misrepresenting that the underlying loans complied with underwriting guidelines." *Id.* at 734–35. In opposing summary judgment, the purchaser identified two types of (mis)representations on which it relied in deciding to buy the securities: "RBS's written representations that the loans underlying its securities complied with underwriting guidelines, and RBS's oral representations that it performed due diligence on every deal to confirm guidelines compliance." *Id.* at 739. The district court ruled that the oral misrepresentations presented "a new, independent theory of liability" that impermissibly expanded the scope of the claims. *CMFG Life Ins. Co. v. RBS Sec., Inc.*, 2014 WL 3696233, at *17 (N.D. Ill. July 23, 2014). The Seventh Circuit reversed, holding that the oral representations were "simply another factual basis" supporting the plaintiff's preexisting theory that it was entitled to "rescission based on misrepresentation of guidelines compliance,"

and that the complaint could be read to encompass both. *CMFG*, 799 F.3d at 743.

■ Kostovetsky's summary judgment response falls on the permissible side of the line. According to Ambit, because the complaint alleges that Kostovetsky's bills doubled "[a]fter switching to Ambit," Doc. 1 at ¶ 12, he is limited to arguing that the increase occurred "*directly* after" he enrolled with Ambit, as opposed to thirteen months later. Doc. 131 at 3 (emphasis added). But the complaint does not plead that the drastic rate increase occurred *immediately* after Kostovetsky switched to Ambit, and immediacy is not essential to the RICO claim he presses here. *See Chen v. Mayflower Transit, Inc.*, 315 F.Supp.2d 886, 920 (N.D. Ill. 2004) (noting that breaking an allegedly fraudulent promise soon after it was made is only one circumstantial factor relevant to establishing the requisite intent to defraud). Far from engaging in bait-and-switch pleading, Kostovetsky merely added detail with the aid of discovery—placing meat on the bones of the fraud alleged in the complaint.

This is consistent with the design of the Federal Rules, which contemplate that additional facts and evidence will emerge in discovery to help plaintiffs flesh out their claims. *See* Fed. R. Civ. P. 26 advisory committee's note to the 1946 amendment ("The purpose of discovery is to allow a broad search for facts, the names of witnesses, or any other matters which may aid a party in the preparation or presentation of his case."). Recall that Kostovetsky is not aware of having received the notices that Ambit mailed advising him of its rollover policy and the need to renew the Guaranteed Savings Plan, so it is understandable that, at the outset of this suit, he would have been unsure of the precise means by which his savings evaporated. It is therefore reasonable that the complaint does not mention the renewal requirement,

while his summary judgment response does. Doc. 131 at 4. It follows that Ambit's motion to strike is denied.

In the end, however, the denial of Ambit's motion to strike is of no moment, for Kostovetsky's claims, even as set forth in his summary judgment response, fail on the merits.

## A. RICO Claims

■■■ Kostovetsky RICO claims arise under §§ 1962(c) and 1962(d). Section 1962(c) prohibits any individual or entity "employed by or associated with" an "enterprise" engaged in interstate commerce "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). To prove his § 1962(c) claim, Kostovetsky must adduce evidence showing that Ambit engaged in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 822 (7th Cir. 2016); *see also Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655 (7th Cir. 2015); *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 472 (7th Cir. 2007). Section 1962(d) prohibits conspiracies to violate § 1962(c). To prove his § 1962(d) claim, Kostovetsky must adduce evidence showing "that (1) the defendants agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendants further agreed that someone would commit at least two predicate acts to accomplish these goals." *Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 734–35 (7th Cir. 2014) (alteration omitted); *see also DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011).

■■■ Both RICO claims require a showing that Ambit committed or agreed to engage in a pattern of "racketeering activity," a term the RICO statute "define[s] in terms of a long list of crimes." *United States v. Benabe*, 654 F.3d 753, 776 (7th Cir. 2011) (citing 18 U.S.C. § 1961(1)). A "pattern of" racketeering activity requires at least two predicate acts of racketeering over a ten-year period. *See DeGuelle*, 664 F.3d at 199 (citing 18 U.S.C. § 1961(5)). Showing two predicate acts is necessary, though not sufficient, to establish a RICO violation. *See Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1002 (7th Cir. 2004); *Williams v. Aztar Ind. Gaming Corp.*, 351 F.3d 294, 298 (7th Cir. 2003). Establishing that the acts were part of a "pattern" further requires that they be related and pose a continuing threat—requirements generally referred to as "relationship" and "continuity." *See Corley*, 388 F.3d at 1002; *Williams*, 351 F.3d at 298. A plaintiff may rely on similar conduct directed at others to help establish a pattern, but he must nevertheless show that at least one act of racketeering was directed at him and caused him injury. *See Corley*, 388 F.3d at 1004–05 ("[The plaintiff] does need to demonstrate a triable issue of fact on injury to himself from at least one predicate act . . . ."). Both mail fraud and wire fraud—the racketeering acts that Kostovetsky alleges, Doc. 1 at ¶¶ 86, 102—qualify as predicate acts. *See* 18 U.S.C. § 1961(1)(B) (incorporating by reference 18 U.S.C. §§ 1341, 1343); *Bible*, 799 F.3d at 657.

■■■ To establish mail or wire fraud, Kostovetsky must adduce evidence showing: "(1) the defendant's participation in a scheme to defraud; (2) the defendant's commission of the act with intent to defraud; and (3) use of the mails [or interstate wires] in furtherance of the fraudulent scheme." *Bible*, 799 F.3d at 657; *see also United States v. Green*, 648 F.3d 569, 577–78 (7th Cir. 2011) (wire fraud); *Corley*, 388 F.3d at 1005 (mail fraud). "[T]he

words 'to defraud' in the mail fraud statute have the common understanding of wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane or overreaching." *Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 252 (7th Cir. 1995) (alteration in original) (internal quotation marks omitted); *see also Corley*, 388 F.3d at 1005 (same); *Perlman v. Zell*, 185 F.3d 850, 854 (7th Cir. 1999) ("The word 'fraud' in the mail-fraud statute means deliberate, material misrepresentations."); *Spiegel v. Cont'l Ill. Nat'l Bank*, 790 F.2d 638, 646 (7th Cir. 1986) ("[T]he scheme must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension."). Ambit does not dispute its use of the mails or interstate wires, Doc. 68 at 4, 13–14, so the dispositive issue is whether a reasonable jury could find that Ambit participated in a scheme to defraud Kostovetsky, intending to defraud him, under §§ 1341 or 1343.

■ Ambit argues that no fraud occurred when Ambit Illinois rolled Kostovetsky from the Guaranteed Savings Plan to the Select Variable Natural Gas Plan, because his terms of service disclosed that he had to renew his Guaranteed Savings Plan in order to remain on that plan and that he would roll over to the Select Variable Natural Gas Plan if he did not renew. Doc. 68 at 10–12. Kostovetsky counters that he was not on notice of the terms of service, because he did not personally assent to them when he signed up through the consultant and because he never saw them thereafter. Doc. 101 at 32–33. As explained above, the undisputed evidence shows that Kostovetsky *did* have notice of the terms of service—he received two separate mailings containing them and/or alerting him to the renewal requirement. This means that he could easily have informed himself of the need to renew well

in advance of his August 2014 rollover. *See Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148 (7th Cir. 1997) ("A contract need not be read to be effective; people who accept take the risk that the unread terms may in retrospect prove unwelcome."). Kostovetsky's receipt of the terms of service shortly after he signed up, and again a year later, combined with his decision to continue as an Ambit customer, amounted to an acquiescence in those terms—whether or not he actually read them. *See Boomer*, 309 F.3d at 415 ("Boomer had a reasonable opportunity to reject AT&T's offer, but nonetheless continued to use his AT&T services—services that were offered with the clear and explicit expectation of compensation. Under these circumstances, Boomer's silence constituted an acceptance."); *Hill*, 105 F.3d at 1150 (holding that customers were bound by the defendant's terms of service, including provisions they did not read, where they ordered a computer over the phone, received the terms of service in the mail along with the shipment, and did not return the product); *Spivey*, 660 F.Supp.2d at 948–49 (applying *Hill* where the terms related to a monthly service and were mailed on their own as opposed to being "included with a physical product"), *aff'd*, 622 F.3d 816 (7th Cir. 2010); *Schafer v. AT&T Wireless Servs., Inc.*, 2005 WL 850459, at *5 (S.D. Ill. Apr. 1, 2005) ("Illinois courts have recognized ... that it is a 'well settled rule of law that when a party to a contract is able to read [its terms] *and has the opportunity to do so*, he cannot thereafter be heard to say he was ignorant of its terms and conditions.'"); *cf. James v. McDonald's Corp.*, 417 F.3d 672, 675, 678 (7th Cir. 2005) (holding, under Kentucky law, that a fast-food customer was bound by contest terms despite not having read them, where "the rules were posted near the food counter, on the back of in-store tray liners, and near the drive-thru window").

Because Kostovetsky was on notice of the renewal requirement, there was no fraudulent misrepresentation in Ambit Illinois's switching him to the Select Variable Natural Gas Plan when he did not renew his Guaranteed Savings Plan. This conclusion accords with *Corley v. Rosewood Care Center, Inc. of Peoria, supra.* The plaintiff, Corley, brought a RICO suit founded on mail fraud allegations against Rosewood, which operated his elderly mother's nursing home. 388 F.3d at 996–97. Like Kostovetsky, Corley alleged "a classic bait and switch scheme," identifying various unfulfilled promises that Rosewood made to induce him to contract with it for his mother's care. *Ibid.* The primary broken promise—and one of Corley's claimed RICO predicate fraudulent acts—was Rosewood's assurance that "any increase in the cost of the private suite would stay in line with price increases for the other [less expensive] room types." *Id.* at 995. Relying on that assurance, Corley contracted for a private suite at a daily rate of $70. *Ibid.* The contract Corley signed, however, "permitted Rosewood to raise the base rate of any room at any time," while giving him the right "to terminate the contract at any time," and provided that the contract was "the entire agreement between the parties." *Id.* at 995, 1006. Once the contract was signed and Corley's mother moved in, Rosewood increased the price of her private suite several times, beginning almost immediately. *Id.* at 995–96. Within a year, Corley was paying $122 per day—"a whopping 74% increase"—while semi-private room rates had increased only 13.7%. *Id.* at 996. A dispositive issue in the case was whether the broken room rate promise was "a predicate act[ ] on which to rest RICO liability." *Id.* at 1005–06.

The Seventh Circuit held that this alleged bait-and-switch was not an act of fraud on which Corley could predicate his RICO claim, giving three reasons. First, "Corley could hardly claim he was de-ceived or injured by a price increase in and of itself when that risk was explicitly disclosed in the contract." *Id.* at 1006. Second, the provision empowering Corley to terminate the contract at any time independently doomed the claim: "If fraud was Rosewood's aim, it went about the process in a very unlikely manner by giving residents an absolute out that would protect them from injury." *Id.* at 1007. Third, Corley failed to show fraud as opposed to mere breach of contract: "The fact that Rosewood subsequently broke a promise is not evidence that it never intended to keep the promise when made. ... Fraud requires much more than simply not following through on contractual or other promises. It requires a showing of deception at the time the promise is made." *Id.* at 1007. Because the room rate promise was not fraudulent and did not injure Corley, the Seventh Circuit held that Corley failed to prove a predicate RICO act, thereby warranting summary judgment. *Id.* at 1008.

If Rosewood's conduct in *Corley* did not qualify as mail fraud or, by extension, racketeering, then neither does Ambit's rolling Kostovetsky from the Guaranteed Savings Plan to the Select Variable Natural Gas Plan. Like Rosewood, Ambit explicitly reserved in its terms of service the right to do what it did—roll Kostovetsky onto a different plan if he did not renew his current one. *See Corley*, 388 F.3d at 1006; *see also Perlman*, 185 F.3d at 855 ("No 'fraud' was involved because the defendants told [the plaintiff] exactly what they were doing ...."); *Assocs. in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561, 570–71 (7th Cir. 1991) (holding that there was no fraud, and thus no RICO violation, where the defendant allegedly promised lofty returns but the parties' contract said otherwise, reasoning that "no jury could find that a reasonable investor would be misled ... when the truth was under his nose in black and

white"); *Reynolds v. E. Dyer Dev. Co.*, 882 F.2d 1249, 1252 (7th Cir. 1989) (holding that because mail and wire fraud require "active or elaborate concealment," there was no fraud, and thus no RICO violation, where the allegedly undisclosed information was "a matter of public record" and available upon request to the plaintiffs). Also like Rosewood, Ambit gave Kostovetsky an "absolute out"—the terms of service empowered him to renew the Guaranteed Savings Plan, or switch back onto it after rolling over, simply by notifying Ambit of his desire to do so. *See Corley*, 388 F.3d at 1007; *see also Richards*, 55 F.3d at 252–53 (7th Cir. 1995) (holding that there was no fraud, and thus no RICO violation, where the plaintiffs alleged that the defendant insurance companies schemed to keep excess premiums by failing to inform customers that refunds were not automatic, reasoning that even if the "defendants had taken steps to ensure they were not asked" for refunds, "the defendants said they would return the premium and ... did return premiums" when requested).

It is likely that Ambit Illinois was counting on a material segment of its customer base automatically rolling onto the pricier Select Variable Natural Gas Plan due to inertia and inattentiveness. *Compare* Richard H. Thaler & Cass R. Sunstein, *Nudge: Improving Decisions About Health, Wealth, and Happiness* 85–87 (2009) (noting that "if, for a given choice, there is a default option—an option that will obtain if the chooser does nothing—then we can expect a large number of people to end up with that option, whether or not it is good for them," and that many businesses "have discovered the immense power of default options"), *with* Doc. 134 at ¶ 25 (quoting an Ambit financial model predicting that, "[c]onservatively, we expect 65% of the expiring customers to roll to the variable/select product"). That may be a distasteful way of doing business, but it was not fraudulent and thus not racketeering.

*See United States v. Weimert*, 819 F.3d 351, 357 (7th Cir. 2016) ("The mail and wire fraud statutes do not cover all behavior which strays from the ideal.") (internal quotation marks omitted); *Reynolds*, 882 F.2d at 1252 ("Not all conduct that strikes a court as sharp dealing or unethical conduct is a scheme or artifice to defraud.") (internal quotation marks omitted); *Richards v. Combined Ins. Co. of Am.*, 1993 WL 528043, at *3 (N.D. Ill. Dec. 17, 1993) (holding that, even though the defendant was "prey[ing] upon consumers' inattention and resulting failure to seek refunds," RICO was not "the proper vehicle to right the wrongs done to Plaintiffs"), *aff'd*, 55 F.3d 247, 250 (quoting this language).

■ There remains one other avenue by which Kostovetsky might prove the fraud predicate of his RICO claims: his assertion that Ambit misled him by promising to charge a "competitive" rate on the Select Variable Natural Gas Plan, when in fact its prices later soared relative to both the Guaranteed Savings Plan's rates and Nicor's rates. Doc. 101 at 24–25. A reasonable jury might have found that Ambit broke this promise—at times it was charging Select Variable Natural Gas Plan customers more than double Nicor's rate. Doc. 134 at ¶¶ 39, 45–46. And that broken promise might have been actionable as a breach of contract or under a state consumer protection statute. *See Silvis v. Ambit Energy L.P.*, 674 Fed.Appx. 164, 166 (3d Cir. 2017) (reversing summary judgment against a Pennsylvania consumer who alleged "that Ambit breached [her] contract by charging rates that did not meet the contractual obligation to provide a competitive rate") (internal quotation marks, omitted). But a broken promise or breached contract, in and of itself, is not fraud or racketeering. *See Perlman*, 185 F.3d at 853 ("Breach of contract is not fraud, and a series of broken promises

therefore is not a pattern of fraud. It is correspondingly difficult to recast a dispute about broken promises into a claim of racketeering under RICO.").

When distinguishing run-of-the-mill broken promises and breached contracts from RICO fraud, the second element of mail and wire fraud is crucial: there must be evidence of intent to defraud. *See Bankcard Am., Inc. v. Universal Bancard Sys., Inc.*, 203 F.3d 477, 485 (7th Cir. 2000) ("For a mail and wire fraud RICO violation to exist there must have been intent to defraud."); *Perlman*, 185 F.3d at 852 ("Breach of contract is not fraud; only making a promise with the intent not to keep it deserves that epithet."); *Richards*, 55 F.3d at 252 ("Without ... an intent [to defraud], there can be no mail fraud."). And not just any intent to defraud will do; rather, the intent must have existed "at the time the promise [was] made." *Corley*, 388 F.3d at 1007; *see also United States v. Fenzl*, 670 F.3d 778, 783 (7th Cir. 2012) (explaining that under the mail and wire fraud statutes, "a decision made after the contract was signed" to break a promise contained therein would not support a fraud claim, but "an intention formed during the bidding process" would); *Perlman*, 185 F.3d at 853 (explaining that predicate acts of fraud may be established by conduct that also constitutes breach of contract only if "the evidence shows outright lies and a plan not to keep one's promises"). It is the plaintiff's burden to adduce evidence from which a reasonable jury could find contemporaneous fraudulent intent. *See Perlman*, 185 F.3d at 853.

Kostovetsky has adduced no direct evidence of this fraudulent intent. But "specific intent to defraud may be established by circumstantial evidence and by inferences ... which demonstrate that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. Paneras*, 222 F.3d 406, 410 (7th Cir. 2000). Such circumstantial evidence could be "a pattern of deceit in the defendant's business activities." *Ibid.* It also could be "a breach that follows so closely on the heels of a promise that the intent not to keep the promise may be inferred." *Chen*, 315 F.Supp.2d at 920; *see also AAR Int'l, Inc. v. Vacances Heliades, S.A.*, 202 F.Supp.2d 788, 798–99 (N.D. Ill. 2002) (same, discussing fraud under Illinois law). A defendant's "efforts to 'conceal' its pricing practices also [can] provide some ... support for the inference of intent to deceive." *United States v. Bank of N.Y. Mellon*, 941 F.Supp.2d 438, 469 (S.D.N.Y. 2013); *see also Reynolds*, 882 F.2d at 1252 (holding that "active or elaborate concealment" is evidence of mail and wire fraud). Conversely, "[w]hen the substance of the promise is fairly debatable ... and many promises are kept for extended periods before a dispute breaks out, it is hard to see how it could be said that the defendants never intended to keep their bargains." *Perlman*, 185 F.3d at 852.

*Chen v. Mayflower Transit, Inc.*, *supra*, illustrates the kind of circumstantial evidence that suffices to prove fraud. In *Chen*, a local moving company—acting on behalf of the defendant, a trucking firm that coordinated interstate moves through a network of local movers—promised Chen orally and in writing that the cost of moving her possessions to Chicago would be an amount "not to exceed $1,741.89." 315 F.Supp.2d at 892. The defendant knew that its local movers made such promises and did not discourage them, even though it controlled the billing and "d[id] not intend for the shipper's estimate to be an absolute cap on cost." *Id.* at 897. The paperwork received by Chen clarified that the estimate did not extend to certain vague "services to be performed at destination" that might be added later, and it offered conflicting signals about whether Chen had or needed approval to pay by

credit card when her possessions arrived. *Id.* at 892–93. Informed on the day the truck arrived in Chicago that she could not pay by credit card, Chen could not produce sufficient cash or a cashier's check, so the movers put her possessions in storage to await payment, ultimately holding them for three months and imposing thousands of dollars in additional fees. *Id.* at 894–96. Those fees covered both the storage and various surcharges for the width of the street at her destination, the size of her elevator, and other delivery-day inconveniences. *Id.* at 895. Other customers had similar experiences. *Id.* at 899.

The court held that Chen had adduced evidence sufficient to "support an inference of intent to defraud." *Id.* at 920. The evidence showed that although the defendant "kn[e]w that some shippers [were] confused by the use of the phrase 'not to exceed'" and the written agreements misleadingly specified the cost of some services but omitted others, the defendant continued to charge more. *Ibid.* Moreover, Chen "did not simply fail to read the terms ... (and was therefore inattentive)," and "members of the enterprise made clear misrepresentations or lies about the effect of the agreement." *Id.* at 921.

■ Unlike Chen, Kostovetsky has failed to adduce evidence from which a reasonable jury could infer that Ambit Illinois's June 2013 promise of "competitive" rates on the Select Variable Natural Gas Plan was accompanied by a contemporaneous intent to defraud him. Although *Chen* has *some* features in common with this case—most notably the Ambit consultant's arguably misleading oral representation that Kostovetsky would save money "no matter what"—two key distinguishing facts warrant a different result. First, the timing of Ambit Illinois's promise and the rate increase do not synch up. In *Chen*, the promise was broken at the first and only opportunity. Here, Ambit Illinois's June

2013 promise that Kostovetsky would receive "competitive" rates if he rolled over onto the Select Variable Natural Gas Plan was true at the time the promise was made. The Select Variable Natural Gas Plan's rates *were* competitive at that time—they closely tracked the Guaranteed Savings Plan's rates, and thus were comparable to Nicor's rates, until the winter of 2013–14, at least six months *after* the June 2013 promise. Doc. 134 at ¶ 39. And even though the rates spiked that winter, Kostovetsky remained on the Guaranteed Savings Plan until August 2014, so he did not experience uncompetitive rates until over a year after receiving the promise.

If this were a premeditated scheme to charge Kostovetsky uncompetitive rates, one would expect some evidence that Ambit Illinois never intended to keep the competitive rate promise. The lag between Kostovetsky's enrollment and the rate increase means that timing cannot supply a basis for drawing that inference. *See Corley*, 388 F.3d at 1008 (holding that where the defendant discontinued a promised program ninth months after the plaintiff contracted, the discontinuation alone provided "literally no evidence of fraudulent intent" because the defendant "did in fact operate the ... program for a substantial period of time before terminating it"). Yet Kostovetsky points to no other evidence suggesting that Ambit, in June 2013, *already* had hatched a scheme to pad its bottom line by jacking up rates on the rollover plan, but held the scheme dormant for several months thereafter. To the contrary, the record shows that Ambit had a track record of offering competitive rates on the Select Variable Natural Gas Plan, beginning several years before Kostovetsky enrolled and continuing for several months after. Doc. 134 at ¶ 39; *compare Paneras*, 222 F.3d at 410 (holding that a "pattern of deceit in the defendant's business activities" is evidence of fraud), *with Richards*, 55 F.3d at 252–53 ("[R]egular

payment in the course of doing business, with no sign of reluctance, certainly does not support the plaintiffs' theory that the defendants had adopted the business practice of keeping unearned premiums."). Ambit Illinois's prior track record of keeping the promise at issue and the timing of when it was broken are fatal to Kostovetsky's claim to have been defrauded, and even if not fatal, those circumstances place on him the onus to provide an alternative basis for inferring intent to defraud— which he has failed to do.

The second ground distinguishing this case from *Chen* is that Ambit Illinois's terms of service never locked him into paying the higher rates. This is part and parcel with one of the reasons that Kostovetsky was not defrauded by the rollover policy. Ambit Illinois gave him the means to benefit from the Guaranteed Savings Plan had he simply been a more attentive customer—thus avoiding any harm from its failure to offer competitive rates to Select Variable Natural Gas Plan customers—because its terms of service empowered him both to remain on the Guaranteed Savings Plan before the rollover and to shift back afterward. *See Corley*, 388 F.3d at 1007 ("If fraud was [the defendant]'s aim, it went about the process in a very unlikely manner by giving residents an absolute out that would protect them from injury."); *cf. Chen*, 315 F.Supp.2d at 909 (finding intent to defraud where the defendant "bait[ed its customers] with false promises . . . then, at a point of maximum leverage, demand[ed] additional money").

▮ This is, again, not to say that Ambit's approach to delivering upon its value proposition was admirable, or that Ambit did not breach its contract with Kostovet-

sky or run afoul of state consumer protection law. *See Richards*, 55 F.3d at 250 ("Although the [district] court agreed that the defendants were 'prey[ing] upon consumers' inattention . . .' it nevertheless concluded that RICO was not 'the proper vehicle to right the wrongs done to Plaintiffs.'") (second alteration in original); *Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chi.*, 38 F.3d 1429, 1436 (7th Cir. 1994) (holding that where a contract gave the defendant "some degree of unilateral discretion" to set rates, "the common law duty of good faith and fair dealing requires that the [defendant] exercise that discretion 'reasonably, not arbitrarily, capriciously, or in a manner inconsistent with the expectations of the parties'") (quoting *First Nat'l Bank of Cicero v. Sylvester*, 196 Ill.App.3d 902, 144 Ill.Dec. 24, 554 N.E.2d 1063, 1069 (1990)). But Kostovetsky deliberately declined to bring a contract or state consumer fraud claim—even though the court asked his counsel on the record whether he planned to bring a consumer fraud claim, which, in Illinois as in other States, allows recovery under an unfairness theory as well as a deception theory. *See Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 830 (7th Cir. 2014) ("A plaintiff may allege that conduct is unfair under [the Illinois Consumer Fraud Act] without alleging that the conduct is deceptive."); *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010) ("The elements of a claim under [the Illinois Consumer Fraud Act] are: (1) a deceptive *or* unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce.") (emphasis added).* And Ambit's transparency cuts, as a matter of

---

* On June 15, 2015, at the presentment of Ambit's motion to dismiss, the court asked Kostovetsky's counsel why he did not bring a claim under the Illinois Consumer Fraud Act or, for

the putative class members, under the consumer fraud statutes of other States like California or New Jersey. Counsel answered:

law, against a finding that what occurred here was fraud within the meaning of the mail fraud and wire fraud statutes; it shows that, whatever else Ambit was doing, it was not affirmatively *deceiving* Kostovetsky. *See Paneras*, 222 F.3d at 410 (holding that a criminally fraudulent scheme must be "reasonably calculated to deceive persons of ordinary prudence and comprehension"); *Richards*, 55 F.3d at 252 (holding that, where the "mechanics" of obtaining refunds that allegedly had been fraudulently withheld were "hardly made difficult" by the insurance certificates at issue, those certificates "when viewed in their entirety ... d[id] not provide evidence that they are instruments in a scheme to defraud").

In sum, Kostovetsky has failed to show that a reasonable jury could find that Ambit's conduct was fraudulent under the mail fraud and wire fraud statutes. Having failed to prove any predicate act of racketeering, he cannot proceed with his RICO claims.

## B. Unjust Enrichment Claim

Kostovetsky's unjust enrichment claim fails along with his RICO claims. Citing *Cleary v. Philip Morris, Inc.*, 656 F.3d 511, 516 (7th Cir. 2011), and *Association Benefit Services, Inc. v. Caremark Rx, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007), Ambit's opening brief argued that "if an unjust enrichment claim is based on the same allegedly improper conduct as another claim, and the related claim fails, so does the unjust enrichment claim." Doc. 68 at 15. Kostovetsky's only response was that "because the scheme to defraud will not be dismissed in Ambit's favor, the Court should decline Ambit's invitation to dismiss the unjust enrichment claim." Doc. 101 at 35–36. Kostovetsky has thus forfeited any argument that his unjust enrichment claim can stand alone once his RICO claims fail. *See Nichols*, 755 F.3d at 600; *G & S Holdings LLC*, 697 F.3d at 538; *Salas*, 493 F.3d at 924.

 Even putting aside forfeiture, Ambit is correct that the unjust enrichment claim falls with the RICO claims. Dispositive on this point is *Association Benefit Services*, which holds that, under Illinois law, "when the plaintiff's particular theory of unjust enrichment is based on alleged fraudulent dealings and we reject the plaintiff's claims that those dealings, in-

"Frankly, your Honor, I think that sometimes with consumer fraud, there's issues of reliance, individualized issues, so it definitely was with an eye to class cert. We are still reviewing their motion and deciding and I'm evaluating whether we want to amend to include such counts, so that's something we'll take into account." Kostovetsky never sought to amend his complaint to add state statutory consumer fraud claims, and he did not defend against Ambit's motion to dismiss or summary judgment motion by arguing that he was bringing such claims, so he has forfeited any such claim he might have had. *See Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."); *G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court."); *Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 924 (7th Cir. 2007) ("[A] party forfeits any argument it fails to raise in a brief opposing summary judgment."). Kostovetsky's strategy turned out to be unwise in hindsight, but it also was questionable at its inception: even assuming it would be difficult or impossible to certify a state consumer fraud class, he could have attempted to pursue both a RICO class claim as well as individual contract and state consumer fraud claims. This is not to say the state law claims would have prevailed, *see Cafferty, Clobes, Meriwether & Sprengel, LLP v. XO Comm'cns Servs., LLC*, 850 F.3d 840 (7th Cir. 2017), but Kostovetsky did not even try with respect to either the competitive rates promise or the rollover from the Guaranteed Savings Plan.

deed, *were* fraudulent, the theory of unjust enrichment that the plaintiff has pursued is no longer viable." 493 F.3d at 855; *see also Martis v. Grinnell Mut. Reinsurance Co.*, 388 Ill.App.3d 1017, 329 Ill.Dec. 82, 905 N.E.2d 920, 928 (2009) ("When an underlying claim of fraud ... is deficient, a claim for unjust enrichment should also be dismissed."). *Association Benefit Services* and *Martis* involved Illinois law fraud claims, while the fraud alleged here arises under federal law, but because the elements needed to prove common law fraud are more demanding than federal mail and wire fraud, *see Richards*, 55 F.3d at 251 ("It is well established that the crime of mail fraud does not encompass all the strict requirements of common law fraud."), a different result does not obtain where the fraud allegations are federal.

## II. Argentieri's and the *Simmons* Plaintiffs' Motions to Intervene

Argentieri seeks permissive intervention under Civil Rule 24(b). A court may allow intervention under Rule 24(b) only if: (1) a claim or defense of the would-be intervenor has "a question of law or fact in common" with the main action; and (2) the intervention request is timely. *Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 949 (7th Cir. 2000). (In addition, there must be "independent jurisdiction" over the intervenor's claims, *Sec. Ins. Co. of Hartford v. Schipporeit, Inc.*, 69 F.3d 1377, 1381 (7th Cir. 1995), which exists here because Argentieri raises the same federal RICO and supplemental unjust enrichment claims as Kostovetsky, Doc. 105–1.) Whether to grant permissive intervention is committed to the court's discretion. *See City of Chicago v. FEMA*, 660 F.3d 980, 987 (7th Cir. 2011); *Griffith v. Univ. Hosp., L.L.C.*, 249 F.3d 658, 661–62 (7th Cir. 2001); *Sokaogon Chippewa Cmty.*, 214 F.3d at 949.

The court will assume that the common question requirement is met—notwithstanding Ambit's arguments to the contrary, Doc. 144 at 6–7—because the intervention motion's timeliness is dispositive. "As soon as a prospective intervenor knows or has reason to know that his interests might be adversely affected by the outcome of the litigation he must move promptly to intervene." *Sokaogon Chippewa Cmty.*, 214 F.3d at 949; *see also United States v. S. Bend Cmty. Sch. Corp.*, 710 F.2d 394, 396 (7th Cir. 1983). Four factors bear on whether a permissive intervention motion is timely: "(1) the length of time the intervenor knew or should have known of his interest in the case; (2) the prejudice caused to the original parties by the delay; (3) the prejudice to the intervenor if the motion is denied; (4) any other unusual circumstances." *Sokaogon Chippewa Cmty.*, 214 F.3d at 949; *see also Ragsdale v. Turnock*, 941 F.2d 501, 504 (7th Cir. 1991).

The first factor—how long Argentieri knew or should have known of her interest in the case—cuts against intervention. This suit was filed in March 2015. Doc. 1. Argentieri alleges that she became aware "[i]n or about April 2015" that her local Ambit supplier was charging her much higher rates than her incumbent utility would have. Doc. 100–18 at ¶ 8; Doc. 105–1 at ¶ 17. Ambit moved for summary judgment against Kostovetsky on January 29, 2016, prior to any motion by him to certify a class. Doc. 67. By agreement, limited discovery followed, with a deadline of April 18, 2016, later extended to May 9, 2016. Docs. 78, 93.

Once discovery was complete, Argentieri—represented by Kostovetsky's lawyers—moved to intervene on June 6, 2016, the same day Kostovetsky responded to Ambit's summary judgment motion. Doc. 101; Doc. 105. Ambit argues that this was

an undue delay, noting that the intervention motion was brought more than a year after this suit was filed and that, for the vast majority of that time, Argentieri was aware that Ambit had violated her rights and therefore should have known about this litigation. Doc. 144 at 4–5. Argentieri counters that there was no undue delay because, as a putative class member, she had no reason to think that her interests would be adversely affected by this litigation—even assuming she knew or should have known about it—until facts emerged casting Kostovetsky's claims in a worse light than hers. Doc. 147 at 6–7.

■■■■ As a general proposition, a year's delay between a prospective intervenor's becoming aware that she is the victim of corporate misconduct and her attempt to intervene may be undue. *See Southmark Corp. v. Cagan*, 950 F.2d 416, 418–19 (7th Cir. 1991) (holding that a fifteen month delay was excessive); *Cent. States, Se. & Sw. Areas Pension Fund v. Gopher News Co.*, 542 F.Supp.2d 823, 828–29 (N.D. Ill. 2008) (holding that an approximately one year delay was excessive). That said, the timeliness rules are more forgiving where the lawsuit is a class action and the intervenor is a putative or actual class member; unnamed class members may reasonably presume, at least until events prove the presumption inaccurate, that their interests are being adequately represented by the class representatives. *See United Airlines v. McDonald*, 432 U.S. 385, 394, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1977) (holding that a class member's post-judgment motion to intervene for the purpose of appealing the denial of class certification was timely, where the prospective intervenor "quickly sought to enter the litigation" as soon as it came to light that the named plaintiffs would not appeal the decision); *Crawford v. Equifax Payment Servs.*, 201 F.3d 877, 880 (7th Cir. 2000) (measuring timeliness of intervention from the moment that

"class members suspect that the representative is not acting in their best interest," where the absent class members sought intervention to oppose a proposed settlement that awarded them no damages and that barred them from pursuing parallel class actions they had already initiated); *Hill v. W. Elec. Co.*, 672 F.2d 381, 385–86 (4th Cir. 1982) (measuring timeliness of intervention from the denial of the putative class representatives' certiorari petition challenging an appellate decision that they were not adequate representatives for the prospective intervenors); *Foster v. Gueory*, 655 F.2d 1319, 1324 (D.C. Cir. 1981) (measuring timeliness of intervention from the day the court denied class certification because, "[u]ntil that denial, appellants might have reasonably believed they could secure relief as members of a plaintiff class"). The other cases cited by Argentieri, while factually far afield from this one, offer variations on that theme. *See In re Grand Jury Proceedings*, 655 F.2d 882, 885 n.2 (8th Cir. 1981) (following *McDonald*, outside the class action context, to allow post-judgment intervention by a third party seeking to pursue an abandoned appeal that affected his interests); *Stallworth v. Monsanto Co.*, 558 F.2d 257, 260, 267 (5th Cir. 1977) (measuring timeliness of intervention from the court's entry of a consent order after settlement of a class action brought by minority employees alleging employment discrimination, where the prospective intervenors were non-party white employees whose seniority rights were affected by the settlement).

The rule set forth in those cases fits awkwardly with Argentieri's situation, however, because she invokes it simultaneously with a disavowal of any argument that Kostovetsky "is an unfit class representative"; to the contrary, Argentieri insists Ambit's summary judgment motion against Kostovetsky is meritless. Doc. 147 at 6. The gist of Argentieri's justification

for intervening seems to be that her claim presents different—and presumably stronger—facts than Kostovetsky's. *Ibid.* But if Kostovetsky's claims were meritorious (and Argentieri's even more so), why would Ambit's summary judgment motion trigger concern that her interests were unprotected? More likely, Argentieri's real concern was that Kostovetsky's claims would fail—which would suggest he was not, in fact, an adequate class representative. *See Wiesmueller v. Kosobucki*, 513 F.3d 784, 787 (7th Cir. 2008) ("One way to try to knock [a class action] off at low cost is to seek summary judgment before the suit is certified as a class action. A decision that the claim of the named plaintiff lacks merit ordinarily, though not invariably, ... disqualifies the named plaintiffs as proper class representatives.") (ellipsis in original). Argentieri is arguing at cross-purposes with herself. But she has nevertheless made an arguable case for the proposition that, at least in some instances, a grant of summary judgment against a named plaintiff is the appropriate triggering event against which to judge an intervening class member's delay or lack thereof, since it operates as a sort of *de facto* denial of class certification. *See Larson v. JPMorgan Chase & Co.*, 530 F.3d 578, 583 (7th Cir. 2008) (measuring the delay of an intervention motion from the grant of summary judgment against named plaintiffs representing a subclass to which the prospective intervenor belonged).

Nevertheless, under the circumstances of this case, Argentieri could have and should have acted sooner. Even if she is correct that she was entitled to await unfavorable developments in this litigation before stepping in, she knew or should have known about the weaknesses of Kostovetsky's claim when Ambit filed its summary judgment motion in January 2016. Yet she chose to wait and see if several months of discovery would play out in Kostovetsky's favor before putting forward her suppos-

edly stronger claim. Although lasting only a few months, that delay was unwarranted—especially given that Argentieri and Kostovetsky have the same lawyers, who were on notice of the arguments that Ambit was making against Kostovetsky as soon as its summary judgment motion was filed, and who presumably became aware of the factual predicates of that motion even earlier. *See Southmark Corp.*, 950 F.2d at 418 ("Since petitioner is represented by the same lawyer as the receiver and is a member of the class in [a related lawsuit], also pending below, the delay in seeking to intervene herein is particularly inexcusable."); *Kruse v. Wells Fargo Home Mortg., Inc.*, 2006 WL 1212512, at *7 (E.D.N.Y. May 3, 2006) (after granting summary judgment against the named plaintiffs, finding an intervention motion by a new slate of proposed named plaintiffs untimely where "it should have been clear to plaintiffs' counsel that the original named plaintiffs' claims were meritless" once the factual predicate for the dismissal emerged in discovery). The decision to let discovery play out before seeking Argentieri's intervention reflected a gamble by the lawyers that further discovery would prove Ambit's motion to be meritless, allowing Kostovetsky to continue to shoulder the load—and such strategic judgments are indicative of undue delay. *See Larson*, 530 F.3d at 583–84 (affirming the district court's finding of untimeliness where, among other things, the intervenor "appear[ed] to have acted for strategic reasons"). This factor therefore weighs against granting intervention.

 ▪ The second timeliness factor—the prejudice to the original parties—also cuts against Argentieri. "[P]ermissive intervention is to be denied if it would unduly delay or prejudice the adjudication of the rights of the original parties." *Southmark Corp.*, 950 F.2d at 419; *see also*

*Heartwood, Inc. v. U.S. Forest Serv., Inc.*, 316 F.3d 694, 701 (7th Cir. 2003) (reversing the district court's grant of permissive intervention where it "failed to consider whether intervention would cause undue delay or prejudice"). A principal reason for "the [timeliness] requirement is to prevent a tardy intervenor from derailing a lawsuit within sight of the terminal." *Sokaogon Chippewa Cmty.*, 214 F.3d at 949 (alteration in original); *see also Larson*, 530 F.3d at 584 (affirming the district court's finding of untimeliness where, among other things, the "attempt to intervene delayed a settlement"); *Cent. States, Se. & Sw. Areas Pension Fund*, 542 F.Supp.2d at 829 (denying intervention where it would "delay resolution" of the suit). Accordingly, a prospective intervenor's not seeking intervention until a potentially dispositive summary judgment motion is filed weighs strongly against intervention. *See Southmark Corp.*, 950 F.2d at 419 ("Certainly the adjudication of the rights of the original parties would be unduly delayed here because the lawsuit ... is already pending on a motion for summary judgment.").

That is precisely the situation here. Argentieri argues that she should be allowed to intervene because this case remains "in its infancy," with "little discovery ha[ving] occurred" thus far. Doc. 105 to 6. That characterization is inaccurate; Argentieri failed to seek intervention until Kostovetsky's suit was on life support—briefing had been ordered, and discovery completed, on what turned out to be a fatal summary judgment motion. Allowing Argentieri's new claims at this late stage, alleging mistreatment by a different Ambit entity (Ambit New York, not Ambit Illinois) on different facts, would effectively reopen a dismissed case and necessitate burdensome additional discovery. *See Kruse*, 2006 WL 1212512, at *5 (after granting summary judgment in a putative class action against the named plaintiffs, denying permissive intervention by alternative class representatives where "discovery ... into the claims of the named plaintiffs ... was already completed"); *Jones v. GES Exposition Servs., Inc.*, 2004 WL 2011396, at *9 (N.D. Ill. Sept. 7, 2004) ("The new discovery that would be necessary to litigate the proposed intervenors' claims ... would be substantial, and addition of these individuals would make this suit unnecessarily complex, unwieldy and prolonged—which precedent teaches is a sufficient reason to deny permissive intervention.") (internal quotation marks omitted). The prejudice factor, then, weighs against intervention. The factor might have played out differently had Argentieri sought intervention *before* Ambit moved for summary judgment against Kostovetsky, but she did not.

The third factor also disfavors intervention, as there is no prejudice to Argentieri from denying her motion because she remains free to file her own suit or remain a putative class member in *Simmons*. *See Cent. States, Se. & Sw. Areas Pension Fund*, 542 F.Supp.2d at 829 (denying intervention where the intervenors could "file their claims elsewhere"). Notably, the *Simmons* suit includes claims under both general and utility-specific New York consumer protection laws that have withstood scrutiny to date. Doc. 152 at 8–9 (describing the benefits of the additional New York claims brought by the *Simmons* Plaintiffs); Doc. 156–1 at 29–35 (the *Simmons* complaint, describing those claims); Doc. 161 (noting that the *Simmons* claims recently survived a motion to dismiss). That makes *Simmons* at least as strong a vehicle—or perhaps a stronger one—for vindicating Argentieri's rights as the RICO-or-bust strategy Kostovetsky pursued here. *See Jones*, 2004 WL 2011396, at *10 (denying permissive intervention where the "denial of intervention will not materially harm the proposed intervenors").

Finally, as to the fourth factor, Argentieri does not attempt to argue that "unusual circumstances" favor her motion. In fact, the only unusual circumstance here is the appearance by the *Simmons* Plaintiffs for the purpose of opposing Argentieri's motion, plausibly asserting that they would suffer prejudice if Argentieri, a New York consumer who seeks to represent many of the same putative class members, is allowed to join this suit. Doc. 152 at 8 ("The *Simmons* Plaintiffs have asserted claims in the New York action that could be adversely impacted under principles of collateral estoppel by a ruling adverse to Argentieri."); Doc. 157 at 3–5. Even if Kostovetsky were correct that the *Simmons* Plaintiffs have ways to avoid their worst collateral estoppel fears, Doc. 156 at 4–6, the considerable overlap between the two cases may create other headaches in one or both suits. *Cf. La-Duke v. Burlington N. R.R. Co.*, 879 F.2d 1556 (7th Cir. 1989) ("[T]he results of simultaneous litigation of identical issues in the state and federal courts may be both unseemly and a grand waste of the efforts of the parties and the courts.") (internal quotation marks omitted).

In sum, applying the four timeliness factors, the court finds that Argentieri's intervention motion was untimely and thus should be denied. Because the *Simmons* Plaintiffs moved to intervene only "for the limited purpose of opposing" Argentieri's motion, Doc. 152, their intervention motion is denied as moot.

Before concluding, it bears mention that allowing Argentieri to intervene here, rather than to pursue her own suit or remain a putative class member in *Simmons*, would make no practical sense. Kostovetsky's claims have been defeated, and he (together with Ambit Illinois) was this suit's best, and perhaps only, connection to Illinois. Now that his claims have been dismissed, Argentieri, a New York resident and customer of Ambit New York, should proceed, if at all, in New York. *Cf. Kruse*, 2006 WL 1212512, at *8 (simultaneously denying permissive intervention to would-be replacement class representatives and holding in the alternative that venue would be improper because all prospective intervenors resided, and were allegedly wronged, in other districts).

### Conclusion

Ambit's summary judgment motion is granted and its motion to strike is denied, Argentieri's motion to intervene is denied, and the *Simmons* Plaintiffs' motion to intervene is denied as moot. Judgment will be entered in favor of Ambit and against Kostovetsky.